EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Consejo de Titulares del Condominio Condesa del Mar<br><br>Peticionario<br><br>v.<br><br>Eduardo Chamah Martínez<br><br>Recurrido | Certiorari<br><br>2019 TSPR 71<br><br>202 DPR ____ |

Número del Caso: AC-2018-2


Fecha: 15 de abril de 2019


Tribunal de Apelaciones:


     Región Judicial de Carolina – Guayama, Panel IX


Abogados de la parte peticionaria:

     Lcdo. Rafael E. Rivera Sánchez
     Lcda. Gwendollyn Feliciano Reyes
     Lcdo. Michel Godreau


Abogado de la parte recurrida:

     Lcdo. José Alfredo Prats


Materia: Sentencia con Opiniones disidentes.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Consejo de Titulares del Condominio Condesa del Mar<br><br>Peticionario<br><br>v.<br><br>Eduardo Chamah Martínez<br><br>Recurrido | **Núm.** <u>AC-2018-0002</u> | |

SENTENCIA

En San Juan, Puerto Rico, a 15 de abril de 2019.

La controversia inicial en este caso requería evaluar la compatibilidad de los arrendamientos a corto plazo con el uso residencial al que está destinado un bien inmueble sujeto al Régimen de Propiedad Horizontal, conforme a su escritura matriz y reglamento. No obstante, en vista de ciertos cambios fácticos acaecidos durante el trámite apelativo del pleito, nos corresponde determinar, como cuestión de umbral, si la controversia continúa siendo una justiciable o si, por el contrario, advino académica como consecuencia de un cambio sustancial en el estado de Derecho que rige la relación entre las partes. Veamos.

I.

El 14 de abril de 2015, el Consejo de Titulares del Condominio Condesa del Mar (Condominio) presentó ante el Tribunal de Primera Instancia, Sala de Carolina, una *Petición de Sentencia Declaratoria, Interdicto Preliminar y Permanente* en contra del Sr. Eduardo Chamah Martínez, titular

del apartamiento 702 del Condominio. En ésta, le solicitó al foro primario que ordenara al señor Chamah Martínez cesar y desistir de alquilar su unidad en calidad de hospedería, dado que dicha explotación comercial violentaba las disposiciones contenidas en la escritura matriz y el reglamento constitutivo del régimen de propiedad horizontal en la propiedad. Para fundamentar la procedencia de un remedio interdictal, el Consejo de Titulares arguyó que, ante la negativa del señor Chamah Martínez de cesar el uso ilegal de su unidad de vivienda, los titulares estaban sufriendo -y continuarían sufriendo- daños inmediatos, graves e irreparables que ponían en riesgo la seguridad, el bienestar y la tranquilidad del resto de los titulares. En su Petición, además, el Consejo alegó que el señor Chamah Martínez estaba promocionando y arrendando su apartamiento a corto plazo mediante una plataforma electrónica destinada a esos fines, llamada *Home Away* y que tal situación había generado malestar entre los residentes del Condominio.

Luego de varios trámites procesales, incluyendo el desistimiento de la petición de interdicto preliminar por parte del Consejo de Titulares, el Tribunal de Primera Instancia dictó una *Sentencia Declaratoria* mediante la cual concluyó que el derecho al uso y disfrute de la propiedad del señor Chamah Martínez estaba limitado y supeditado a lo establecido en la escritura matriz y el reglamento. A esos efectos, el foro primario concluyó que el destino del Condominio era residencial y que el alquiler de una unidad a

corto plazo era incompatible con ese destino. Consiguientemente, el Tribunal de Primera Instancia declaró con lugar la demanda presentada y ordenó al señor Chamah Martínez satisfacer la suma de $1,000 en concepto de honorarios de abogado.

Inconforme, el señor Chamah Martínez presentó un recurso de apelación ante el Tribunal de Apelaciones. El 10 de agosto de 2017, ese foro dictó una sentencia y revocó el dictamen del Tribunal de Primera Instancia. Fundamentó su dictamen en el sentido amplio que debía atribuírsele a la palabra "uso" y cómo en aquellas instancias en que se pretenda prohibir una actividad específica en un inmueble sujeto al régimen de propiedad horizontal la prohibición se deberá hacer constar de forma expresa en la escritura matriz del condominio. *Véase Sentencia del TA*, en la pág. 4. El Tribunal de Apelaciones concluyó que el arrendamiento a corto plazo no variaba el uso o destino del condominio, puesto que el arrendatario a corto plazo "está dándole a la propiedad un uso residencial". *Id.* en la pág. 7.

Luego de que la reconsideración de ese dictamen fuese declarada no ha lugar, el Consejo de Titulares acudió ante este Tribunal mediante un recurso de apelación.[1] En éste, planteó como señalamientos de error los siguientes:

_____

[1] Según arguyó, el dictamen del Tribunal de Apelaciones era diametralmente opuesto al dictamen de ese mismo foro en el caso *Rebeka Tosado Collins v. Consejo de Titulares del Condominio Montecielo*, KLRA201600780. Luego de concluir de que el tracto procesal de ese caso era sustancialmente distinto, puesto que se trataba de un recurso de revisión de una determinación del Departamento de Asuntos de Consumidor

Primer error: Erró el Tribunal de Apelaciones al determinar que el arrendamiento por noche no varía el uso o destino del condominio, si quien lo alquila utiliza el apartamento para dormir, descansar, preparar sus alimentos y actividades similares.

Segundo error: Erró el Tribunal de Apelaciones al permitir una actividad comercial en un condominio para uso exclusivamente residencial.

Apelación, en la pág. 6.

El 28 de febrero de 2018, expedimos el auto solicitado y señalamos una vista oral, la cual tuvo lugar el 14 de noviembre de 2018. En ésta, la representación legal del señor Chamah Martínez indicó que de la escritura matriz ni del reglamento del Condominio surgía una prohibición a los alquileres a corto plazo. Arguyó que, por el contrario, en el propio reglamento se contemplaba el alquiler de los apartamientos sin que se estableciera una distinción entre arrendamientos a largo y a corto plazo. Indicó que tal distinción era innecesaria, puesto que las actividades que realizaban los arrendatarios a corto plazo eran las mismas que aquéllas que realizaban los que arrendaban la propiedad por periodos más extensos; a saber, dormir, descansar y realizar otras actividades consistentes con el uso residencial del apartamiento.

La representación legal del Consejo de Titulares, por otro lado, sostuvo que el arrendamiento a corto plazo de las unidades del condominio claramente constituía una

y no de una sentencia declaratoria emitida por el Tribunal de Primera Instancia, acogimos el recurso presentado como un *certiorari*, por entender que era el recurso adecuado.

explotación comercial vedada por la escritura matriz y el reglamento. Destacó que, bajo el razonamiento de la parte recurrida, los hoteles no deberían ser designados como de uso comercial, sino residencial. Según señaló, los requisitos establecidos mediante reglamento a los propietarios que deseaban arrendar sus propiedades dejaban claro que el único tipo de arrendamiento contemplado era aquel a largo plazo.

Durante la vista, además, el representante legal del Consejo de Titulares informó a este Tribunal sobre posibles enmiendas al reglamento del Condominio Condesa del Mar dirigidas a prohibir los arrendamientos a corto plazo. Ante esto, se le ordenó al Consejo comparecer, en un término de noventa (90) días, para notificar cuál había sido el resultado de ese proceso de enmienda.

En cumplimiento con esta orden, el 11 de febrero de 2019, el Consejo de Titulares compareció para informar que la enmienda había sido aprobada y presentada ante el Registro de la Propiedad el 7 de diciembre de 2018. Acompañó su moción con la Escritura Número 22, titulada *Enmienda a Reglamento y Escritura Matriz*. En lo que atañe la controversia ante nuestra consideración, la escritura enmienda el Artículo 27 del Reglamento del Condominio para que disponga lo siguiente:

> Realizarlas de acuerdo con el destino dado al edificio el cual es exclusivamente residencial. Ningún titular podrá establecer en el edificio ninguna forma de explotación comercial, a menos que expresamente se autorice por la unanimidad de los titulares. Se prohíben los arrendamientos por noches, por fines de semana, a corto plazo ("short term"), se prohíben los arrendamientos tipo Homeaway, Airbnb y cualquier otra variación de las

mismas que impliquen actividad comercial, turística, entre otras.

Según se establece en la escritura, esta enmienda surtirá efecto a partir de la fecha de su presentación en el Registro de la Propiedad. Ante este desarrollo fáctico, corresponde determinar si la controversia ante nuestra consideración advino académica como consecuencia del cambio al estado de Derecho vigente entre las partes.

## II.

En reiteradas instancias este Tribunal ha establecido que "[u]na controversia puede convertirse en académica cuando los cambios fácticos o judiciales acaecidos durante el trámite judicial tornan en ficticia su solución, convirtiéndose así en una opinión consultiva sobre asuntos abstractos de derecho". *P.P.D. v. Gobernador I*, 139 DPR 643, 675-676 (1995). La academicidad, cual doctrina de autolimitación judicial, tiene el propósito de "evitar el uso inadecuado de recursos judiciales y obviar precedentes innecesarios". *PNP v. Carrasquillo*, 166 DPR 70, 75 (2005) (citas omitidas). La determinación de academicidad ha de hacerse en función de una evaluación ponderada de los cambios a los hechos o al derecho aplicable para determinar si éstos suponen que la controversia entre las partes ha cesado de existir. Véase id; *Com. de la Mujer v. Srio. de Justicia*, 109 DPR 715 (1980).

De otra parte, cuando estos cambios ocurren en la etapa apelativa, nos compete, como máximo foro judicial, tomar

medidas cautelares que propendan la certidumbre y seguridad entre las partes. A tenor con ese deber, en *Berberena v. Echegoyen*, 128 DPR 864 (1991) pautamos que, cónsono con la jurisprudencia federal en cuanto a este tema, cuando un caso se torna académico y los cambios fácticos que originaron la academicidad no resultan de un acuerdo entre las partes "el decreto del tribunal de instancia queda anulado (vacated) y el caso se devuelve con órdenes de desestimar la demanda". *Berberena*, 128 DPR en la pág. 870. Esta norma sirve el propósito de evitar que dictámenes emitidos para controversias que se tornaron académicas sigan en vigor y puedan afectar los derechos de las partes. Véase *Moreno v. UPR II*, 178 DPR 969 (2010).

La desestimación de la causa de acción incoada y la derogación de los dictámenes de los foros inferiores no sólo promueve la certeza y seguridad judicial, sino que también deja el camino libre a la litigación futura de las disputas entre las partes sin perjudicar a ninguna de ellas por una decisión que, para todos los efectos, era preliminar y, como consecuencia de la academicidad del recurso, advino ineficaz y consultiva. *Id.*[2]

---

[2] El dictamen se fundamentó en lo resuelto por el Tribunal Supremo de los Estados Unidos en *United States v. Munsingwear, Inc.*, 340 US 36, 39-40 (1950) ("The established practice of the Court in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss. That was said in *Duke Power Co. v. Greenwood County*, 299 U.S. 259, 267, 57 S.Ct. 202, 205, 81 L.Ed. 178, to be 'the duty of the appellate court'. That procedure clears the path for future relitigation of the

En fin, cuando el cambio en el estado de Derecho entre las partes ocurre en la etapa apelativa, tenemos el deber de tomar medidas cautelares adicionales a la desestimación del recurso ante nuestra consideración. Específicamente, nos corresponde dejar sin efecto los dictámenes de los foros inferiores y devolver el caso al Tribunal de Primera Instancia con instrucciones para que desestime la causa de acción en su totalidad. *Moreno*, 178 DPR en la pág. 975.

### III.

En el caso ante nuestra consideración, la enmienda al Reglamento del Condominio Condesa del Mar mediante la cual se prohíben expresamente los arrendamientos a corto plazo ciertamente pone fin a la controversia que originó el litigio entre las partes. La actuación que sirvió de base para la reclamación presentada ante el Tribunal de Primera Instancia por el Consejo de Titulares fue justamente el arrendamiento, por parte del recurrido, de su unidad residencial por periodos cortos de tiempo mediante el uso de la plataforma virtual *Home Away*. Esta conducta, conforme al nuevo estado de Derecho que rige la relación entre las partes, está actualmente prohibida por el Reglamento del Condominio. En atención a ello, resulta forzoso concluir que la controversia planteada en el recurso presentado por el Consejo de

---

issues between the parties and eliminates a judgment, review of which was prevented through happenstance. When that procedure is followed, the rights of all parties are preserved; none is prejudiced by a decision which in the statutory scheme was only preliminary.").

Titulares se ha tornado académica y procede dictar sentencia desestimando el recurso ante nuestra consideración. Igualmente, procede dejar sin efectos los dictámenes emitidos por el Tribunal de Primera Instancia y el Tribunal de Apelaciones.

**IV.**

Por los fundamentos que anteceden y en virtud del cambio fáctico que representa la prohibición expresa contenida en las enmiendas al Reglamento, según éstas fueron aprobadas por la Junta de Condóminos y presentadas para su debida inscripción ante el Registro de la Propiedad, se dicta sentencia desestimando el recurso de *certiorari* presentado por el Consejo de Titulares. Asimismo, se dejan sin efecto las sentencias dictadas por los foros recurridos y se devuelve el caso al Tribunal de Primera Instancia, Sala Superior de San Juan, para que proceda a desestimar la causa de acción presentada por el Consejo de Titulares por ésta haberse tornado académica.

Así lo pronunció el Tribunal y certifica el Secretario del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez disiente y emite una opinión disidente. El Juez Asociado señor Estrella Martínez disiente y emite una opinión disidente. El Juez Asociado señor Colón Pérez hace constar la siguiente expresión:

> "Toda vez que el Consejo de Titulares de un Condominio sujeto al Régimen de Propiedad Horizontal puede, <u>mediante reglamento</u>, aclarar el alcance de cierta cláusula en la escritura matriz relacionada al uso que se le brinda a los

apartamentos que componen el mismo, bien para permitir prohibir cierta actividad, tal como sucedió en la causa de epígrafe -- tornando así el presente caso en académico --, estamos conformes con el resultado en el día de hoy."


                              José Ignacio Campos Pérez
                              Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Consejo de Titulares del Condominio Condesa del Mar<br><br>Peticionario<br><br>v.<br><br>Eduardo Chamah Martínez<br><br>Recurrido | **Núm.** AC-2018-0002 | |

Opinión Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

En San Juan, Puerto Rico, a 15 de abril de 2019.

Lamento profundamente que este Tribunal desaprovechara la oportunidad que presentaba el caso de epígrafe para atender y resolver una controversia tan acuciante como la planteada. Controversia que, además, incide directamente en el derecho propietario de miles de titulares que residen en condominios de uso exclusivamente residencial sujetos al régimen de propiedad horizontal. Esto, a pesar de la expansión desmedida de los alquileres a corto plazo en nuestra jurisdicción y la ausencia de legislación y reglamentación que regule este nuevo modelo de empresarismo comercial. La utilización para fines comerciales de los apartamientos sitos en este tipo de inmueble afecta la tranquilidad, seguridad y sana convivencia de esos titulares cuyos derechos hoy permanecen en suspenso.

Por entender que el pleito ante nuestra consideración no se tornó académico con las enmiendas realizadas al Reglamento del Condominio Condesa del Mar, disiento del

proceder mayoritario. En esencia, la controversia ante la consideración de este Tribunal requería evaluar la compatibilidad de los arrendamientos a corto plazo con el uso residencial al que está destinado un bien inmueble sujeto al Régimen de Propiedad Horizontal. Por entender que los cambios fácticos acaecidos durante el trámite apelativo del presente pleito no tornaron esa controversia en una académica, disiento del dictamen mayoritario.

## I.

Un análisis cabal del Derecho aplicable a la controversia planteada -así como su jurisprudencia interpretativa- me obliga a concluir que los alquileres a corto plazo son incompatibles con el uso exclusivamente residencial al que está destinado un bien inmueble sujeto al régimen de Propiedad Horizontal. Considero que, en este caso, la prohibición expresa a los alquileres a corto plazo contenida en el reglamento es redundante y en nada afecta la vigencia de la controversia ante la consideración de este Tribunal.

De hecho, el representante legal del señor Chamah Martínez reconoció que una enmienda al reglamento del Condominio no tendría el efecto de disponer de la controversia, puesto que dicha actuación por parte del Consejo sería una "ultra vires" y "nula". Según arguyó, la enmienda representaría añadir una prohibición que no existía en la escritura matriz y que eso solamente podía hacerse por unanimidad. Destacó que la controversia ante la consideración

de este Tribunal giraba en torno al contenido de la escritura matriz, por lo que la misma subsistiría si la enmienda sólo afectaba el reglamento. *Regrabación de Vista Oral de 14 de noviembre de 2018*, 11:38:20-11:39:12.

En cuanto a este aspecto, conviene destacar que, en la *Moción en cumplimiento de orden* presentada con posterioridad a la celebración de la vista oral, el Consejo de Titulares también arguyó que la controversia planteada en este caso no se había tornado académica con las enmiendas realizadas. Subrayó que el propio representante legal del señor Chamah Martínez había afirmado durante la vista oral que la única manera de prohibir los arrendamientos a corto plazo era mediante una enmienda a la escritura matriz del Condominio, lo que requeriría el voto unánime de los titulares.

Ante este cuadro, no sorprendería que la enmienda realizada sea impugnada por el propio señor Chamah Martínez, lo que resultaría en la continuación del presente pleito y la recurrencia de la controversia ante nuestra consideración entre las mismas partes. Las enmiendas realizadas también podrían ser objeto de impugnación por otros residentes del condominio que deseen alquilar sus apartamentos a corto plazo para propósitos turísticos y comerciales, lo que podría, a su vez, resultar en una multiplicidad de pleitos que versen sobre la misma controversia.

Al margen de esta realidad, consideraciones de economía procesal militan a favor de que este Tribunal se exprese sobre la controversia planteada. A fin de cuentas, un reclamo

de que un caso se ha tornado académico en una etapa tan avanzada de los procedimientos no debe ser óbice para que el foro de mayor jerarquía ante el cual se ventila el pleito determine que el mejor curso de acción es pautar la norma que, en lo sucesivo, ha de regir en los foros inferiores. *Véase* Erwin Chemerinsky, *Constitutional Law: Principles and Policies*, en la pág. 115 (2011 4ta ed.). ("When a case is dismissed on appeal, there is a fully developed record and an opportunity for a definitive resolution of an issue. Dismissing such a case as moot might cause the same question to be litigated in many other courts until it is finally resolved by the Supreme Court.")[3]

## II.

Los hechos y el tracto procesal del caso se resumen en la sentencia que antecede. En virtud de éstos, la controversia cuya academicidad hoy se decreta requería examinar, en primer lugar, la naturaleza del régimen de

---

[3] Véase, además, *Honig v. Doe*, 484 US 305, 331–32 (1988)(Rehnquist J. Op. Concurrente) ("I believe that we should adopt an additional exception to our present mootness doctrine for those cases where the events which render the case moot have supervened since our grant of certiorari or noting of probable jurisdiction in the case. Dissents from denial of certiorari in this Court illustrate the proposition that the roughly 150 or 160 cases which we decide each year on the merits are less than the number of cases warranting review by us if we are to remain, as Chief Justice Taft said many years ago, 'the last word on every important issue under the Constitution and the statutes of the United States.' But these unique resources—the time spent preparing to decide the case by reading briefs, hearing oral argument, and conferring—are squandered in every case in which it becomes apparent after the decisional process is underway that we may not reach the question presented.").

propiedad horizontal en nuestro ordenamiento con particular énfasis en la importancia de la escritura matriz y los reglamentos en la constitución y consumación de éste. Veamos.

### III.

### A.

El fin último del régimen de propiedad horizontal, según dispone la propia Ley de Condominios, Ley Núm. 103 de 5 de abril de 2003, 31 LPRA sec. 1291 *et seq.*, es propiciar un balance entre el derecho al disfrute de un titular de su propiedad privada y los derechos de los demás titulares al disfrute de sus respectivas propiedades.[4] Por tal razón, el ejercicio del pleno dominio en un inmueble sujeto al régimen de propiedad horizontal no puede tener el efecto de menoscabar los derechos propietarios de los otros condóminos. *Véase* 31 LPRA sec. 1291n. Estos derechos e interacciones, así como los pormenores relacionados con la administración de las áreas que conforman la horizontalidad, se delimitan y consignan en la Ley de Condominios y su reglamento, así como

---

[4] Desde la óptica de la política pública que motivó la adopción de legislación que regulara el régimen de propiedad horizontal, conviene señalar que, inicialmente, se procuró la agrupación de personas en zonas urbanas "donde, debido al alto costo de los solares, no les sería posible ubicarse a cada uno de ellos individualmente". Diario de Sesiones, Vol. 10, Tomo 4 1958, en la pág. 2004. Posteriormente, en la exposición de motivos de la Ley Núm. 157 del 4 de junio de 1976 que enmendó la primera ley aprobada en 1958, se afirmó que esa política pública sobre la utilización de terrenos estaba dirigida a "estimular que las familias puertorriqueñas residan en proyectos multi-familiares". Así, pues, la imperante necesidad de residencias en áreas urbanas de otra manera inasequibles para las familias puertorriqueñas sirvió como puntal en la institución y el desarrollo del régimen de propiedad horizontal en nuestro ordenamiento.

en la escritura matriz y el reglamento de cada inmueble sometido al régimen.

En el pasado, hemos sido consistentes al dictaminar que la escritura matriz de un condominio sujeto al régimen de propiedad horizontal pasa a ser un estatuto privado al cual se adhieren los titulares, ya sea cuando someten el inmueble a la horizontalidad o cuando adquieren algún apartamiento. *Consejo de Titulares v. Vargas*, 101 DPR 579, 582-583 (1973). De esta manera, la escritura matriz constituye el documento rector principal del régimen luego de la Ley de Propiedad Horizontal y su reglamento y, además, es "la fuente vinculante más importante para los condóminos". Michel Godreau Robles, *El condominio: El régimen de propiedad horizontal en Puerto Rico*, en la pág. 71 (Dictum 1992). Ello, puesto que, al comprar sus respectivos apartamientos, todos y cada uno de los titulares llevaron a efecto un claro acto de adhesión a lo allí estipulado. *Cond. Prof. S.J.H. Centre v. P.R.F., Inc.*, 133 DPR 488, 501 (1993).

La escritura matriz, a su vez, una vez inscrita en el Registro de la Propiedad, es vinculante para todos los propietarios y para terceros. Después de todo, como se dijo, los acuerdos y pactos recogidos en la escritura matriz de cualquier inmueble sujeto al régimen de propiedad horizontal conforman la ley entre las partes y obligan sucesivamente a los nuevos adquirientes. *Arce v. Caribbean Home Const. Corp.*, 108 DPR 225, 245 (1978). La inscripción en el Registro de la Propiedad brinda publicidad a esos acuerdos y advierte

adecuadamente a futuros adquirientes sobre las restricciones al uso del inmueble que podrían derivar de los mismos.

Como fuente rectora adicional a la escritura matriz, el reglamento de cada condominio delimita con aún mayor precisión los pormenores relacionados con la administración del inmueble y regula las interacciones entre los titulares, así como los deberes y obligaciones recíprocas que nacen de la horizontalidad. En cuanto a esto, el Artículo 36 de la Ley de Condominios establece lo siguiente:

> La administración de todo inmueble constituido en propiedad horizontal se regirá por lo dispuesto en este Capítulo, y además por un reglamento que deberá insertarse en la escritura de su constitución, o que se agregará a dicha escritura. Copia certificada de dicha escritura y del Reglamento, y de toda enmienda a los mismos, deberá quedar archivada en el registro de la propiedad.

31 LPRA sec. 1293.

En cuanto a estos requisitos de inserción a la escritura matriz y presentación ante el Registro, comenta el profesor Godreau Robles que "la inscripción conjunta de la escritura y el reglamento no significa que ambos documentos queden fundidos como una sola fuente o que tengan la misma importancia". Godreau Robles, *supra*, en la pág. 75. A esos efectos, explica que "[l]a posibilidad de enmendar el Reglamento con sólo dos terceras partes -lo que implica que una tercera parte se haya opuesto- distingue esa fuente de la escritura matriz, considerada como un verdadero contrato, cuya modificación no puede imponerse si hay una oposición de tal envergadura". *Id.*

En el pasado, este Tribunal ha sostenido que el Reglamento es "una gestión legalmente indispensable para lograr la creación formal del régimen e imprescindible para hacer posible el regular el ejercicio y desenvolvimiento de los derechos derivados de la combinación de la propiedad común con los diversos dominios individuales". *Arce v. Caribbean Home Const. Corp.*, 108 DPR 225, 250 (1978). Al margen de las diferencias que pueden identificarse entre la escritura matriz y el reglamento de un inmueble sujeto a la propiedad horizontal, queda claro que "ambos constituyen un contrato entre las partes." *Soto Vázquez*, 138 DPR 282 (1995). De ahí que el requisito de inscripción permita que las disposiciones contenidas en el reglamento también sean oponibles a terceros y a futuros adquirientes.

**B.**

En lo pertinente a la controversia ante la consideración de este Tribunal, la Ley de Condominios impone una limitación general al ejercicio del derecho al pleno dominio y disfrute de un titular en un condominio al disponer que "la escritura matriz que establezca el régimen de propiedad horizontal expresará clara y precisamente el uso a que será destinada toda área comprendida en el inmueble, y una vez fijado dicho uso sólo podrá ser variado mediante el consentimiento unánime de los titulares". 31 LPRA sec. 1291.[5] En cuanto a las

---

[5] Esta limitación en la variación del uso se remonta a la prohibición contenida en el Art. 330 del Código Civil, 31 LPRA sec. 1275, que figura como el primer referente en nuestra jurisdicción sobre la naturaleza jurídica de la forma especial de copropiedad que supone la horizontalidad. La

unidades individualizadas del inmueble, el Artículo 15 de la Ley de Condominios dispone que "cada apartamiento se dedicará únicamente al uso dispuesto para el mismo en la escritura [matriz]". 31 LPRA sec. 1291m(a). Es decir, tanto las áreas comunes como los apartamientos individuales están sujetos a esta restricción, por lo que su uso ha de ser compatible con el destino que se le asigne en la escritura matriz.

Ciertamente, esta limitación sobre el uso o destino del inmueble y sus distintos componentes responde a la expectativa de que los titulares no utilizarán su apartamiento de forma tal que se obstaculice el uso adecuado de los demás apartamientos y/o áreas comunes, ya que, como se indicó, el ordenamiento propende a proteger el derecho de todos los titulares al disfrute de sus respectivas propiedades individuales. *Véase Consejo Titulares v. Ramos*, 186 DPR 311, 324 (2012). La exigencia de una delimitación del uso del inmueble y los apartamientos y demás elementos que lo componen es, además, una de carácter contractual, puesto que la propia ley mandata su inclusión en la escritura matriz mediante la cual se constituye el régimen.[6]

---

restricción sobre cambios al uso de los apartamientos dentro del inmueble fue adoptada en la primera legislación sobre el régimen de propiedad horizontal en el 1958. Posteriormente, en el 1976, la limitación se extiende a todas las áreas comprendidas en el inmueble.

[6] Al enumerar las distintas exigencias relacionadas con la designación de un uso particular al inmueble y sus distintos elementos, Eduardo Vázquez Bote evalúa las facultades dispositivas de los elementos privativos que conserva el titular, entre las cuales señala la posibilidad de la destrucción o consumo de la cosa. Al considerar las limitaciones relativas a cómo las segregaciones o agrupaciones pueden tener el efecto de variar el uso

En atención al requerimiento de la Ley de Condominios acerca de la necesidad de una expresión clara y precisa sobre el uso al que estará destinado el inmueble, así como la prohibición de variación de uso de los apartamientos contenida en el Artículo 15 de la referida ley, resulta indispensable examinar lo dispuesto en la escritura matriz y el Reglamento del Condominio Condesa del Mar.

**IV.**

Mediante escritura pública otorgada el 28 de agosto de 1986 se constituyó el régimen de propiedad horizontal en el Condominio Condesa del Mar. En ésta, con relación al elemento y destino del inmueble, se consignó que "[e]l edificio está destinado a residencias y facilidades relacionadas". *Véase* Ap. en la pág. 157. Acto seguido, al enumerar los elementos del edificio, establece que éste consta de "noventa y ocho apartamentos residenciales". *Id.* Asimismo, en la descripción de las plantas típicas del condominio, la escritura matriz dispone que "en cada una de estas plantas hay siete (7) apartamentos residenciales". *Id.* en la pág. 151. Por último, en la sección que provee una descripción individualizada de cada apartamento, se describe el apartamento del aquí recurrido, señor Chamah Martínez, como uno de "uso residencial". *Id.* en la pág. 198.

---

dispuesto en la escritura matriz comenta lo siguiente: "[r]econozco, naturalmente, que los preceptos enumerados tenían originalmente una intención completamente distinta de la que ahora señalo. **Preocupaba al legislador, básicamente, evitar que apartamentos en horizontalidad se dedicasen a funciones hoteleras**". Eduardo Vázquez Bote, Derechos Reales II, T. VIII, en la pág. 144 (énfasis suplido).

Junto a esta escritura matriz, se insertó y se hizo formar parte de ella el *Reglamento para la administración del edificio de propiedad horizontal denominado Condesa del Mar* (Reglamento), también con fecha del 28 de agosto de 1986. En éste se consignan disposiciones adicionales relacionadas con el uso o destino del inmueble y las áreas que lo componen, incluyendo los apartamientos individuales. En cuanto al ámbito de aplicabilidad del Reglamento, su Artículo 3 dispone que "todos los propietarios, arrendatarios y sus sucesores en interés de los noventa y ocho (98) apartamentos de que se compone el edificio vienen obligados a acatar y cumplir plenamente todos los preceptos . . . cuya fuerza compulsoria también obligará a los que en el futuro entren a formar parte del Régimen". Ap. en la pág. 261.

En lo que concierne al destino asignado a los apartamientos en la escritura matriz, el Artículo 18 del Reglamento obliga a cada titular que "en el disfrute y aprovechamiento de su apartamento o unidad privativa, tendrá que estarse obligatoriamente al destino que se le haya asignado, debiendo ajustar en todo momento su conducta al orden, disciplina, moralidad, decoro y normas de convivencia establecidas por la Ley y este Reglamento". *Id.* en la pág. 270. Asimismo, el Artículo 27 establece que el uso y disfrute de cada unidad privativa tendrá que realizarse "de acuerdo con el destino dado al edificio". *Id.* en la pág. 273. Ese mismo articulado dispone que "ningún titular podrá establecer en el edificio ninguna otra forma de explotación, a menos

que expresamente se autorice por todos los titulares". *Id.* El Artículo 27, además, prohíbe a los titulares producir "ruidos o molestias, ni daños, ni ejecutar actos que perturben la tranquilidad de los demás titulares o de los vecinos". *Id.*

Como una prohibición adicional relacionada con el uso de los apartamientos, el Artículo 38 del Reglamento establece que "ningún propietario podrá variar el destino dado a su unidad privativa sin contar con el previo consentimiento de la totalidad de los miembros del Consejo de Titulares; y además, con el consentimiento del acreedor hipotecario, en caso de que el Condominio esté gravado con hipoteca". *Id.* en la pág. 278. Estas restricciones contenidas en el Reglamento reflejan no sólo el carácter residencial del condominio, según instaurado en la escritura matriz constitutiva del régimen, sino también una prohibición generalizada a cualquier variación al uso residencial de los apartamientos.

De otra parte, el Reglamento también contiene disposiciones relacionadas con los arrendamientos de las unidades y las responsabilidades del arrendador-propietario hacia la administración y los demás condóminos. Específicamente, el Artículo 28 del Reglamento, vigente al momento de los hechos,[7] preceptuaba lo siguiente:

---

[7] Según se relató en la exposición de los hechos contenida en la Sentencia, el Artículo 28 del Reglamento fue enmendado durante el transcurso del presente litigio. En la actualidad, éste prohíbe expresamente los arrendamientos a corto plazo, por noche y aquellos que se realizan mediante plataformas cibernéticas como *Airbnb* y *Home Away*.

Aunque se reconoce al propietario el derecho de arrendar su unidad privativa, por efecto de dicho contrato será responsable directo de lo siguiente:

(a) Deberá ponerlo en conocimiento del Consejo de Titulares por Conducto del Administrador

(b) Responderá de la moralidad, buenas costumbres y cumplimiento del Reglamento por parte del arrendatario.

(c) El propietario seguirá siendo el responsable exclusivo de las contribuciones para los gastos comunes.

(d) Hacer constar en el Contrato de Arrendamiento que el arrendatario conoce este Reglamento y las demás bases del Régimen de Condominio y que se obliga a acatarlas y cumplirlas en todas sus disposiciones.

*Id.* en la pág. 274.

La inclusión de este artículo en el Reglamento original reconoció el derecho de un propietario a arrendar su apartamiento, siempre y cuando notificara a la administración tal proceder e incluyera en el contrato de arrendamiento una cláusula mediante la cual el arrendatario certificara que conocía las normas del edificio y se obligara a su cumplimiento. Cónsono con estas condiciones, se dispuso en el Artículo 29 del Reglamento que

Independientemente del derecho del arrendatario, el Consejo de Titulares, por acuerdo de quienes representan la mayoría, tiene acción para pedir la rescisión del Contrato de Arrendamiento o el lanzamiento del arrendatario, cuando éste o cualquiera de los propietarios de la unidad privativa arrendada violen las normas de convivencia a que se refiere el Artículo 27 de este Reglamento, o por padecer enfermedad repugnante o contagiosa, locura o cualquier otro trastorno mental que pueda perturbar la tranquilidad y orden del edificio.

*Id.* en las págs. 274-275.

En otras palabras, ante el incumplimiento de un inquilino con cualquier disposición reglamentaria, el Consejo de Titulares está facultado para iniciar un proceso judicial de lanzamiento o solicitar al titular que rescinda el contrato. Esta facultad, por supuesto, parte de la premisa de la existencia de un contrato escrito, que es al que también alude el Artículo 28 que le antecede. Asimismo, del artículo se presume que el Consejo, en caso de determinar que procede iniciar un procedimiento de lanzamiento en contra del arrendatario, contará con tiempo suficiente para obtener el aval de una mayoría de los titulares e iniciar el proceso judicial.

Finalmente, en las enmiendas al Reglamento inscritas en el Registro mediante la escritura pública número doce (12) del 4 de diciembre de 1998, se incorporaron a éste ciertas reglas relativas al uso de los servicios de seguridad y de las áreas recreativas tales como la piscina, el gimnasio y las canchas de tenis, entre otras. Las enmiendas, además, impusieron reglas y exigencias para los titulares que arrendaran sus propiedades. En el acápite sobre las normas de conducta, se dispuso que el condominio es uno exclusivamente residencial ("Our condominium is exclusively residential"). Ap. en la pág. 289. Asimismo, se reiteró que, aunque los titulares tenían el derecho a alquilar sus propiedades, dicho derecho estaba condicionado al cumplimiento del arrendatario con las reglas contenidas en el Reglamento. ("Although apartment owners are entitled to

renting their apartments, they must advise the Board of Directors through the building administrator. Each apartment owner is responsible for the behavior and adherence to rules and regulations on the part of their rentee.") *Id.* en la pág. 292.

De las disposiciones precitadas surge con meridiana claridad que el Condominio Condesa del Mar y los apartamientos que lo componen son de uso **exclusivamente residencial**. Asimismo, de estas disposiciones se puede colegir que, si bien no existe una prohibición absoluta a los alquileres a corto plazo, el tipo de negocio jurídico que se contempla en el Reglamento es más bien un arrendamiento tradicional a largo plazo. Ello es natural, pues el arrendamiento a corto plazo -es decir, por noche- es un fenómeno reciente y era desconocido en 1986, cuando se constituyó el régimen de propiedad horizontal en el Condominio Condesa del Mar. Corresponde entonces evaluar qué exactamente comporta una designación de uso residencial y si los arrendamientos a corto plazo desvirtúan ese destino y representan el tipo de explotación inherente a un uso comercial.

## V.

### A.

En *Rodríguez v. Twin Towers Corp.*, 102 DPR 355 (1974), mediante una escueta opinión *per curiam*, este Tribunal abordó las implicaciones de destinar un edificio sometido al régimen de propiedad horizontal para uso residencial. Allí, en la

escritura constitutiva del régimen se hizo constar que "todas las unidades del edificio se utilizarían únicamente para propósitos residenciales y que los dueños no realizarían modificaciones estructurales en sus unidades sin antes notificar a la Asociación de Condómines (sic)". A pesar de esta restricción, dos titulares del condominio instalaron una oficina de servicios de ingeniería y arquitectura en un apartamiento y realizaron cambios estructurales al mismo. Varios residentes presentaron una demanda de interdicto. El foro de instancia, sin embargo, desestimó la demanda bajo el fundamento de que la Junta de Planificación había autorizado el uso del apartamiento como oficina profesional.

Este Tribunal, al dirimir la controversia planteada sobre si la concesión de un permiso podía variar el uso al que estaba destinado el apartamiento convertido en oficinas profesionales, reiteró lo resuelto en casos previos respecto a cómo "la mera concesión de un permiso por la Junta de Planificación no tiene el efecto ni el alcance de anular restricciones privadas que resulten inconsistentes con el permiso concedido". *Id.* en la pág. 356. Consecuentemente, determinó que el dictamen del tribunal de instancia desestimando la demanda quebrantaba "el régimen de propiedad horizontal del edificio al cual voluntariamente se sometieron los condómines (sic) destruyendo así el propósito común y legítimo de dedicar los apartamientos al uso residencial exclusivamente". *Id.* en la pág. 357. De esta manera, a pesar de que no adentrarse a dilucidar en detalle qué exactamente

constituía un "uso residencial" *vis-à-vis* un "uso comercial", el Tribunal dejó claro que la operación de oficinas profesionales violentaba el uso residencial al que estaba destinado el apartamiento.

Posteriormente, en *Soto Vázquez v. Vázquez Torres*, 138 DPR 282 (1995), este Tribunal tuvo la oportunidad de evaluar detenidamente el alcance de los distintos usos que se le pueden adscribir a un inmueble sujeto al régimen de propiedad horizontal y establecer una distinción entre los conceptos "comercial" y "residencial".[8] Específicamente, se examinó en detalle la exigencia contenida en la Ley de Propiedad Horizontal de expresar clara y precisamente el uso y/o destino del inmueble en el contexto de un uso comercial. Allí, se reiteró lo resuelto sobre estas designaciones de uso en *Cond. Prof. S.J.H. Centre v. P.R.F., Inc.,* 133 DPR 488, 504-05 (1993) a los efectos de que

> Basta con que se precisen e identifiquen claramente ciertas clases de usos en términos amplios y por definiciones de categorías como vivienda o uso comercial, y que informen debidamente y sin ambigüedades a los nuevos adquirentes y terceros, para que éstos sepan a qué atenerse con respecto a los usos previstos para los diversos apartamientos susceptibles de aprovechamiento individual que conforman el inmueble. ... El criterio más importante al determinar si la designación de un uso cumple con la ley es que informe debidamente y sin ambigüedades a los nuevos adquirentes y terceros

*Soto Vázquez v. Vázquez Torres*, 138 DPR 282, 290-91 (1995)(citas omitidas).

---

[8] Para un análisis cabal de la jurisprudencia en torno a cómo el Tribunal ha delimitado estos conceptos, véase Margarita E. García Cárdenas, Manual de Propiedad Horizontal: La ley de condominios y esquemas jurídicos, en las págs. 37-44 (2015).

El Tribunal expresó, pues, que estas limitaciones respondían a la expectativa de que los apartamentos no se utilizaran para actividades que impidieran el uso adecuado de otros apartamentos o áreas comunes. Sin embargo, se sostuvo que las mismas debían ser interpretadas "de forma estricta y restrictiva". *Id.* en la pág. 291. Ello, por su efecto sobre el derecho propietario de los titulares y, porque a pesar de no estar catalogadas como servidumbres en equidad, constituyen verdaderas "limitaciones a que está sometido este dominio singular del propietario". *Id.* Por tal razón, éstas deben ser interpretadas de forma estricta y restrictiva, pues es principio básico de nuestro ordenamiento que la propiedad se presume libre de cargas y gravámenes. *Id. Véase, además*, Margarita E. García Cárdenas, *supra*, en la pág. 39. Dado que en *Soto Vázquez* la controversia versaba sobre una limitación en un inmueble destinado al uso comercial, se aclaró que la interpretación restrictiva de las limitaciones al uso estaba aún más justificada, puesto que

> el concepto "uso comercial" es más abarcador que el concepto "uso residencial". Así, **cuando en una escritura se restringe el uso o destino de los apartamentos a fines residenciales, la estrechez del concepto informa clara y debidamente al adquirente las limitaciones impuestas a su derecho propietario.** Sin embargo, cuando se restringe el uso de un local a "uso comercial", podemos pensar en una multiplicidad de actividades que se pueden ubicar bajo dicho calificativo. Es decir, el término es tan abarcador que en la mayoría de los casos equivale a una negación de un uso residencial, sin límites en cuanto a los posibles usos relacionados con el "comercio". De esta manera, el tercero interesado, aunque percibe una

> restricción a su derecho propietario, puede
> entender que se le ha brindado cierta flexibilidad
> en cuanto a los usos posibles de su propiedad.

*Sóto Vázquez*, 138 DPR en la pág. 291 (énfasis suplido).

Es decir, el Tribunal razonó que, a diferencia de una limitación impuesta en un inmueble destinado a un uso residencial, una limitación de uso en un edificio comercial debía ser mucho más específica, puesto que el propio término "comercial" era de suyo abarcador y carecía de la especificidad atribuible al término "residencial". Así, se concluyó que la amplitud del concepto "comercial" y la gama de posibilidades de uso que se le podían dar a un local comercial exigía que cualquier restricción adicional a ese uso debía ser específica y excluyente.[9]

Expresiones ulteriores de este Tribunal con relación al concepto de uso residencial se dan en el contexto de controversias relacionadas con cláusulas restrictivas y servidumbres en equidad. Según se explicó, sin embargo, las restricciones impuestas al uso de un inmueble sujeto al régimen de propiedad horizontal han de interpretarse de la misma manera restrictiva en la que se interpretan ese tipo de cláusulas.

En *Residentes de Parkville v. Díaz*, 159 DPR 374 (2003), este Tribunal se enfrentó a una controversia que requería

---

[9] En cuanto al uso de los elementos comunes, en *Rivera Rodríguez v. Junta de Directores*, 173 DPR 475 (2008) se determinó que el arrendamiento de un área para la instalación de antenas requería un voto de unanimidad por parte de los titulares. La determinación del Tribunal se fundamentó en que se trataba de un área común de uso residencial que sería utilizada para propósitos comerciales.

delimitar el alcance de una condición restrictiva de una servidumbre en equidad que limitaba el uso de ciertas propiedades para fines residenciales. La condición restrictiva en cuestión establecía que los lotes no podrían ser utilizados para otro fin que no fuese residencial ("No lot shall be used except for residential purposes"). Los residentes de la urbanización presentaron una demanda contra otros vecinos por incumplimiento con esa condición. Según alegaron, en tres de los lotes de la urbanización se habían establecido negocios comerciales consistentes en dos cuidos de niños -uno de los cuales operaba únicamente en una porción de la propiedad- y una oficina de bienes raíces. El foro primario concluyó que el establecimiento de estos negocios iba en contra de las condiciones restrictivas que gravaban las propiedades, por lo que ordenó el cese de su operación. El Tribunal de Apelaciones, por su parte, modificó ese dictamen, concluyendo que el uso domiciliario limitado de una de las propiedades dedicadas al cuido de niños no violaba la condición restrictiva.

Este Tribunal, luego de evaluar la normativa aplicable a las servidumbres en equidad, así como jurisprudencia de distintos tribunales estatales, determinó que la operación de un cuido de niños en una residencia, aún cuando ocurría de manera incidental, era incompatible con una servidumbre en equidad que restringía el uso de la propiedad para fines residenciales. Por tanto, este Foro revocó el dictamen del Tribunal de Apelaciones mediante el cual se había permitido

la operación de uno de los cuidos de niños en una porción de una de las propiedades. Esto es, se determinó que, aún si se trataba de una actividad accesoria o incidental al uso residencial que se le daba a la propiedad, una lectura de la restricción en controversia apuntaba a que "[e]l claro propósito de [ésta] era lograr que los futuros adquirentes de Parkville pudieran establecer allí su domicilio o morada sin los inconvenientes que en ocasiones conlleva operar negocios dentro de los repartos residenciales o en lugares adyacentes". *Id.* en la pág. 390. Consiguientemente, se expresó que

> Conforme con el propósito referido, la prohibición en cuestión incluye cualquier uso no residencial aunque sólo sea de forma supuestamente incidental o accesoria. No puede haber duda alguna que la finalidad de la servidumbre en equidad se extendía a prohibir el uso de una parte significativa de la residencia (25/C) para el cuido de veinticinco niños. Resolver lo contrario sería soslayar la autonomía de la voluntad de las partes, lo cual no estamos facultados a hacer, salvo que ésta sea contraria a la ley, a la moral o al orden público.

*Id.*

Por último, este Tribunal reiteró que la obtención de un permiso por parte de una agencia gubernamental no podía tener el efecto de invalidar una cláusula restrictiva, puesto que la misma constituía un contrato privado con fuerza de ley entre las partes. Así, al igual que se hizo en *Rodríguez v. Twin Towers Corp.*, 102 DPR 355 (1974), el Tribunal concluyó que, cuando una parte fundamentaba un cambio de uso en una propiedad objeto de una condición restrictiva en la existencia de un permiso para ello, debía prevalecer el

convenio alcanzado por las partes a través de la servidumbre en equidad sobre el permiso de uso que había otorgado la agencia administrativa. *Id.*

También en el contexto de una servidumbre en equidad, en *Rodríguez Pérez v. Gómez*, 156 DPR 307 (2002), unos vecinos presentaron una demanda de entredicho provisional e *injunction* preliminar para cuestionar el establecimiento de una Centro de Rehabilitación. Ese centro, que operaría como una corporación sin fines de lucro, prestaría servicios a personas con problemas de alcoholismo y drogadicción en una zona gravada por una condición restrictiva que prohibía el uso de ese lote para propósitos comerciales. Según alegaron los vecinos, el establecimiento del centro de rehabilitación afectaría la tranquilidad y seguridad de los residentes, puesto que personas extrañas tendrían acceso a la comunidad. *Véase Id.* en la pág. 310. El centro de rehabilitación contestó la demanda y alegó que no operaría un comercio, puesto que era una corporación sin fines de lucro. Posteriormente, y durante el transcurso de los procedimientos, sostuvo que ARPE había recomendado favorablemente la concesión de un permiso para autorizar la operación del centro de rehabilitación.

Luego de que los foros recurridos determinaran que procedía denegar el remedio interdictal solicitado por los vecinos, este Tribunal revocó y dictaminó que la operación del centro de rehabilitación era contraria al uso residencial al que estaba destinado el lote en cuestión. Para llegar a

esta conclusión, se evaluaron las disposiciones del reglamento de zonificación vigente y cómo este definía el uso comercial no solamente en términos de venta, sino también en términos de prestación de servicios. Este Tribunal razonó, además, que la definición de "hospedaje especializado" contenida en el reglamento de zonificación constituía un servicio comercial que sería justamente el que ofrecería el centro de rehabilitación. Por tanto, concluyó que, a pesar de que no se le cobraría suma de dinero alguna a las personas que se hospedaran en el centro, éste sí estaría "llevando a cabo actividades de naturaleza comercial para [su] funcionamiento . . . Incluso, [el Centro] ha hecho propaganda a estos efectos anunciando sus servicios". *Id*. en la pág. 317.

De las decisiones previas de este Tribunal que abordan el concepto "uso residencial" surge que la interpretación que se le ha dado a éste es cónsona con la especificidad propia del término "residencial". Una designación de cualquier área como una residencial, alude forzosamente al establecimiento de viviendas y trae consigo un elemento de permanencia. Es por ello que el acto de residir en un lugar se define como "estar establecido en un lugar". *Diccionario de la lengua española*, Real Academia Española, en la pág. 1956 (2001). El uso residencial, pues, es aquel que sirve para proporcionar alojamiento permanente a las personas con el fin de que éstas puedan establecer en un lugar o espacio determinado su morada o domicilio. En el contexto de la

propiedad horizontal, la jurisprudencia que antecede disipa cualquier duda sobre cómo los inmuebles que se designan para uso residencial son los que tienen el propósito de servir como la vivienda habitual de quienes residan en sus unidades independientes.

Inversamente, aquellos inmuebles sometidos al régimen de propiedad horizontal que se destinan para uso comercial son aquellos en los que los titulares establecen negocios u oficinas profesionales. La peculiaridad de estos inmuebles destinados a uso comercial consiste en que, "[f]uera de los requisitos particulares a distintos negocios existe, no obstante, un hilo conductor, un elemento común entre diversos actos mercantiles: su finalidad, su conexión con el tráfico mercantil, su habitualidad, su atención al valor permutable de las cosas". *Pescadería Rosas, Inc. v. Lozada*, 116 DPR 474 (1985)(citas omitidas).

## B.

En el caso de los arrendamientos a corto plazo de unidades de uso residencial mediante la oferta de las propiedades en plataformas virtuales, la dificultad principal estriba en determinar "si se trata de una actividad realizada de manera profesional, con una asiduidad y una organización determinadas" o "de una actividad accesoria, carente de organización y que no se realiza de forma habitual". Nuria Fernández Pérez, *El alojamiento colaborativo*, en la pág. 58 (Valencia 2018). En el caso ante nuestra consideración, tanto los foros inferiores como las

partes aluden a estatutos y reglamentos que regulan la oferta de alojamientos turísticos. Incluso, como se relató, durante el trámite del litigio, el propio señor Chamah Martínez reconoció haber obtenido un certificado de hostelero emitido por la Compañía de Turismo de Puerto Rico que lo autorizaba a alquilar su apartamiento por periodos menores de noventa (90) días. *Véase* Ap. en la pág. 98. Procede pues, determinar si el arrendamiento a corto plazo que nos ocupa constituye una actividad comercial incompatible con el uso residencial al que está destinado el Condominio Condesa del Mar.

De particular relevancia para la controversia ante nuestra consideración, el Reglamento de Hospederías de Puerto Rico, Reg. Núm. 8856 de 22 de noviembre de 2016, provee la siguiente definición de lo que constituye un arrendamiento a corto plazo:

> Alojamiento Suplementario de Corto Plazo ("Short Term Rentals") – Consiste de alquiler de corto plazo, de cualquier tipo de estructura, habitación, casa o apartamento que por su naturaleza resulta conveniente o de importancia al desarrollo turístico. Operará exclusivamente con fines turísticos, para el alojamiento de huéspedes, mediante paga por un periodo igual o menor a noventa (90) días. Cumplirá con todos los requisitos de registro, licencias, y número de hostelero, requerido por la Compañía. Contará con un mínimo de una (1) unidad hasta un máximo de seis (6) unidades. Será el propósito de esta categoría reglamentar todo tipo de alojamiento a corto plazo disponible a turistas para lograr mejor calidad del producto turístico y atender un segmento del mercado de turistas con opciones de alojamiento turístico suplementario o alternativo, no tradicional. El operador estará disponible para proveer o coordinar un servicio limitado al huésped, según sea solicitado y a costo adicional por parte del huésped.

Reg. Núm. 8856 de 22 de noviembre de 2016.

Un huésped, por su parte, se define en el Reglamento como "toda persona o transeúnte que por un precio use, posea o tenga el derecho o la intención de usar o poseer cualquier habitación o habitaciones en las hospederías por un periodo determinado". *Id.* Asimismo, un "arrendatario con fin turístico" está comprendido dentro de la definición de huésped "independientemente de la forma de contrato, si lo hubiere, que permanezca en el lugar durante un máximo de noventa (90) días". Por último, un "turista o visitante" es aquel que "se traslada de su domicilio habitual a otro punto geográfico, estando ausente de su lugar de residencia habitual más de veinticuatro (24) horas y que pernocta en una hospedería en otro punto geográfico con fines de ocio, recreación, negocios u otros motivos". *Id.*

Asimismo, la *Ley del Impuesto sobre el Canon por Ocupación de Habitación del Estado Libre Asociado de Puerto Rico*, Ley Núm. 272 de 9 de septiembre de 2003,[10] según enmendada por la Ley Núm. 46 del 19 de julio de 2017,[11] provee

---

[10] Esta legislación, como se explica en su exposición de motivos, tiene el propósito de "fortalecer el desarrollo turístico en Puerto Rico, maximizar el beneficio económico que recibe Puerto Rico de cada turista que visita la Isla y generar nuevas fuentes de empleo para los puertorriqueños". Para lograr lo anterior, el estatuto traspasó la responsabilidad de fijar, recaudar y sancionar el impuesto sobre el canon por ocupación de habitación que se le impone a los diversos tipos de hospederías del Departamento de Hacienda a la Compañía de Turismo de Puerto Rico. La utilidad fundamental del canon por ocupación es conseguir que los ingresos que se reciben de la industria del turismo se reinviertan en esta misma industria con miras al desarrollo de dicho sector económico.

[11] Estas enmiendas tuvieron el efecto de ampliar la definición y los criterios con los que debe cumplir un inmueble para

en su Artículo 2 una definición análoga a la contenida en el

Reglamento Núm. 8856 de lo que constituye un alojamiento a

corto plazo o "short term rentals" sujeto al canon por

ocupación de habitación:

> Alojamiento Suplementario a Corto Plazo (short term rentals) — Significa cualquier instalación, edificio o parte de un edificio, dado en alquiler por un período de tiempo menor a noventa (90) días, dedicado al alojamiento de personas mediante paga, cuya instalación, edificio o parte del mismo no sea un hotel, condohotel, hotel todo incluido, motel, parador, pequeña hospedería, casa de hospedaje y/o hotel de apartamentos. Dicho término incluirá, sin limitarse a, cualquier tipo de propuesta de alojamiento alternativo como casas, apartamentos, cabañas, villas, casas rodantes (móviles), flotantes, botes, entre otros conceptos de arrendamientos por un término menor de noventa (90) días.

Una hospedería, de otra parte, constituye cualquier

instalación o edificio amueblado, "regularmente usado y

mantenido abierto para el alojamiento de huéspedes mediante

el pago de un canon de alquiler, que derive sus ingresos del

alquiler o arrendamiento de habitaciones, y que dentro de

sus ofrecimientos provea tarifas de alquiler o arrendamiento

computadas en forma diaria, semanal, fraccional, o mediante

un canon global por concepto de todo incluido". *Id.* Se

_____

que se considere como una hospedería. Esto puesto que, conforme a la exposición de motivos, el turismo había enfrentado una serie de cambios a raíz del auge que ha adquirido la economía compartida (*sharing economy*), así como los mercados en línea, que se convierten en intermediarios entre huéspedes y hospederías. Según se reconoció en la exposición de motivos, estos avances que facilitan el intercambio de bienes y servicios entre personas particulares y alteran el esquema habitual bajo el cual operaba la industria turística, han provocado un desfase entre lo que se consideraba un hostelero a quien le correspondía el pago del canon según la definición de la legislación hasta entonces y quienes- en efecto- estaban fungiendo como tales.

especifica, además, que "el término Hospedería también incluirá hoteles, condohoteles, hoteles todo incluido, moteles, paradores, casas de huéspedes, Alojamiento Suplementario a Corto Plazo (short term rentals), . . .". *Id.*

Por último, la Ley Núm. 272 también contempla la participación de distintos sujetos en los arrendamientos a corto plazo, incluyendo la utilización de plataformas virtuales, al proveer las siguientes definiciones:

> (23) Hostelero — Significa cualquier persona natural o jurídica que opere una Hospedería en Puerto Rico incluyendo, pero sin limitarse a, el dueño, agente, propietario, operador, arrendatario, subarrendatario hipotecario, tenedor de los mismos, proveedores, intermediarios, dueños, u operadores de propiedades que se utilicen como Alojamientos Suplementarios a Corto Plazo (short term rentals). Para efectos de esta Ley, el término agente comprenderá a aquellos individuos incluyendo, sin limitarse a, corredores de bienes raíces que gestionen el cobro de un canon de arrendamiento por concepto de alquiler de Alojamientos Suplementarios a Corto Plazo para el alojamiento de huéspedes.

> (27) Intermediario — Se refiere a cualquier persona natural o jurídica que por cualquier medio, incluyendo el internet o cualquier aplicación tecnológica, ofrezca o facilite la ocupación entre huéspedes y proveedores, dueños, u operadores de propiedades que se utilicen como Alojamientos Suplementarios a Corto Plazo (short term rentals), aunque dicho intermediario no opere, directa o indirectamente, tal propiedad utilizada como Alojamiento Suplementario a Corto Plazo (short term rental). Incluye, además, a personas naturales o jurídicas que promuevan o vendan ofertas, especiales, paquetes de estadías o programas de descuentos para estadías en Hospederías por cualquier medio incluyendo, pero sin limitarse a, internet o cualquier aplicación tecnológica.

13 LPRA secs. 2271(2), (23), (24), (27).

Una lectura cabal de estas definiciones, claramente ideadas para atender las convergencias entre el turismo y el desarrollo de las economías colaborativas, devela que el alojamiento suplementario a corto plazo abarca el arrendamiento por periodos menores de noventa (90) días de cualquier inmueble que no figure entre los que tradicionalmente se habían dedicado a la industria turística.

## VI.

En el presente caso, la contención principal del Consejo de Titulares era que el arrendamiento a corto plazo por parte del señor Chamah Martínez constituía una actividad turística de índole comercial que es del todo incompatible con el uso residencial al que está destinado su apartamiento y el Condominio en su totalidad. El Consejo arguye que las actuaciones del señor Chamah Martínez han tenido el efecto de convertir su apartamiento en una hospedería. Como evidencia de ello, nos remite al anuncio de la propiedad en *Home Away* que detalla los precios por noche y del que surge que la propiedad es promocionada como una que incluye servicios de "*concierge*", masajes, chef privado y "*staff*". *Véase* Ap. en las págs. 29-31.[12]

Según aduce el Consejo, de las definiciones provistas en las leyes y reglamentación promulgadas por el Departamento

---

[12] Durante la vista oral, la representación legal del señor Chamah Martínez arguyó que no se pasó prueba sobre estos extremos ante el foro primario. Del expediente solo surge el anuncio mediante el cual se promocionó el apartamiento en la plataforma *Home Away* y en el que se detalla la oferta de estos servicios suplementarios.

de Hacienda y la Compañía de Turismo surge que las actividades de alojamiento de huéspedes por noches o periodos cortos de tiempo constituyen una actividad turística y, por tanto, comercial. Justamente por ello, el Consejo sostiene que se trata de una actividad altamente regulada para la cual se debe cumplir con todas las obligaciones impuestas a los dueños de hospederías en el País, entre las que figuran la obtención de los seguros, protocolos de seguridad y requisitos físicos de las instalaciones, entre otras cosas. Para todos los efectos, pues, el Consejo arguye que el señor Chamah Martínez le está brindando a su propiedad un uso comercial ilegal.

El señor Chamah Martínez, por su parte, insiste en que una estadía por periodos cortos de tiempo no constituye una explotación comercial y que el reglamento no distingue entre el arrendamiento a largo y a corto plazo. En cuanto a este último tipo de arrendamiento, afirma que el mismo no está prohibido expresamente por el reglamento o la escritura matriz y que el hecho de que exista legislación que lo regule no tiene el efecto de adscribirle la cualidad de comercial.

El Tribunal de Apelaciones acogió los argumentos del señor Chamah Martínez y razonó que, dado que los huéspedes del apartamiento realizaban actividades afines con un uso residencial; entiéndase "dormir, descansar, preparar sus alimentos y actividades similares" *Sentencia del TA*, en la pág. 7. Así, concluyó que el arrendamiento a corto plazo; es decir, por noches, no variaba el uso o destino del

Condominio y que el derecho de un titular a arrendar su apartamiento por el término que entienda conveniente se encuentra subsumido en su derecho a ejercer el pleno dominio sobre su propiedad.

La conclusión y el razonamiento del Tribunal de Apelaciones se aparta sustancialmente del principio rector en el que se sustenta el Régimen de Propiedad Horizontal, el cual procura el balance entre el disfrute individual de la propiedad y la vida en comunidad. El dictamen del foro apelativo intermedio, además, no interpreta correctamente la dimensión limitada intrínseca al concepto "residencial", al fundamentar su conclusión en el uso que le da el huésped y señalar que éste "está dándole a la propiedad un uso residencial" porque quien lo alquila lo utiliza "para dormir, descansar [y] preparar alimentos". Residir es mucho más que esto; el uso residencial trae consigo un elemento de permanencia incompatible con un alojamiento transitorio de noche a noche.

Así, el dictamen del Tribunal de Apelaciones no toma en cuenta el uso que implica el negocio jurídico concertado entre el propietario y el inquilino a corto plazo. Sin lugar a duda, se trata de un negocio jurídico con fines eminentemente comerciales cuyo propósito dista mucho de someter la propiedad objeto de éste a un uso residencial. El uso al que se destina el inmueble ha de evaluarse en función de la causa y el objeto del negocio jurídico, así como el propósito del titular-arrendador y del huésped-arrendatario

al momento de concertar el acuerdo. En este caso, el arrendamiento por noche deriva en una explotación económica incompatible con el uso residencial al que está destinada su propiedad.

El elemento de la transitoriedad es esencial, además, al momento de comparar un arrendamiento a corto plazo con aquel que de ordinario se provee por periodos más extensos de tiempo. El arrendatario a corto plazo que negocia su estadía a través de una plataforma virtual no tiene el propósito de establecerse y residir en la unidad objeto del arrendamiento. Su fin, más bien, es pernoctar de manera transitoria en un lugar determinado pagando un canon de renta que se calcula a base de la duración de su estadía. El arrendatario a corto plazo no reside de forma habitual en el lugar que arrienda y las pertenencias que trae consigo se limitan a lo necesario para permanecer temporeramente en éste. En este sentido, pues, no cabe distinguir entre el arrendatario a corto plazo y el huésped de un hotel, puesto que ambos realizan exactamente las mismas actividades y sus estadías se caracterizan por la misma temporalidad y transitoriedad. Tanto el propietario del hotel como el titular de un apartamiento que se alquila a corto plazo ofrecen sus propiedades para un fin inherentemente comercial y turístico.

En el arrendamiento ordinario, por el contrario, el arrendatario convierte el lugar que arrienda en su vivienda y se desplaza a éste de manera permanente. El titular-

arrendador pierde la posesión mediata de la propiedad por un periodo de tiempo prolongado que se pacta contractualmente. De esta manera, la relación contractual se caracteriza por la permanencia, la certeza y la seguridad, cualidades inusitadas en el arrendamiento a corto plazo o por noches. A diferencia del huésped de un hotel o de un arrendatario a corto plazo, el arrendatario a largo plazo se establece y reside en un lugar determinado por un periodo de tiempo extendido. El arrendatario a largo plazo se integra y participa en la comunidad en la que habita y no es, bajo ningún concepto, un mero huésped o transeúnte. El hecho de que el dueño de una propiedad perciba una potencial ganancia del arriendo de ésta en nada afecta el uso residencial que a esa propiedad le dará el arrendatario. Esa potencial ganancia es inconsecuente para la determinación del uso que el inquilino le está dando al apartamiento. Los inquilinos a corto plazo, cuya renta se calcula en función de días o noches, no le brindan al inmueble un uso residencial por el mero hecho de pernoctar en éste. Mucho menos se puede entender que el negocio jurídico que se concreta entre éstos y el titular tiene un fin residencial.

Un examen integrado de las definiciones contenidas en la Ley Núm. 272 me obliga a concluir que la actividad que el señor Chamah Martínez realiza en su apartamiento constituye un alojamiento suplementario a corto plazo para el cual está obligado a recaudar un impuesto y remitirlo mensualmente a la Compañía de Turismo. Conforme a las definiciones

provistas, el señor Chamah Martínez es un hostelero, su apartamiento es una hospedería y sus inquilinos no son residentes, sino huéspedes u ocupantes. Resulta forzoso colegir, pues, que las actividades que realiza en su propiedad no son de carácter residencial, por lo que son del todo incompatibles con el uso que la escritura matriz y el reglamento le asignan al inmueble y sus distintos elementos. La interpretación que ha hecho este Tribunal de lo que supone un "uso comercial" y expresiones respecto a cómo éste equivale a una negación del uso residencial apuntan a cómo ni tan siquiera la concurrencia de un uso comercial incidental con un uso residencial puede armonizarse con una designación de uso exclusivamente residencial. *Véase Residentes Parkville v. Díaz*, 159 DPR 282 (1995).

En cuanto al alcance del término residencial, me parecen contundentes las expresiones de este Tribunal en *Soto Vázquez* a los efectos de que "cuando en una escritura se restringe el uso o destino de los apartamentos a fines residenciales, la estrechez del concepto informa clara y debidamente al adquirente las limitaciones impuestas a su derecho propietario". *Soto Vázquez*, 138 DPR en la pág. 291. En este caso -además de la designación categórica a un uso residencial contenida en la escritura matriz- otras disposiciones reglamentarias apuntan inequívocamente a la imposibilidad de alquilar los apartamentos a corto plazo y advierten debidamente a los propietarios sobre los deberes y obligaciones que surgen del derecho a arrendar su propiedad.

Específicamente, la facultad que se le reserva a la Junta de iniciar un proceso judicial de lanzamiento o solicitar la rescisión del contrato de arrendamiento evidencian que la intención al momento de imponer estas condiciones fue limitar los arrendamientos a aquellos que fueran por largo plazo.[13] Precisamente por la corta duración del negocio jurídico que supone un arrendamiento a corto plazo, las disposiciones del reglamento que permiten al Consejo solicitar la rescisión del contrato o el lanzamiento del inquilino quedarían inoperantes.

Consideraciones de política pública, además, militan en contra de catalogar la actividad realizada por el señor Chamah Martínez como una de índole residencial y, de esta manera, eximirla de la regulación y fiscalización a la que está sujeta toda actividad comercial que se lleva a cabo de forma legal en nuestro País. Conjuntamente a las obligaciones impuestas por la legislación tributaria y turística reseñada, el uso comercial que suponen los arrendamientos a corto plazo en edificios residenciales tiene implicaciones que trascienden esas esferas de regulación gubernamental.

El uso comercial de un apartamiento destinado a residencia afecta la seguridad, sana convivencia y sentido de comunidad que ha de imperar en un condominio residencial. La entrada y salida de extraños a esa comunidad cuya estadía

---

[13] Del expediente surge, además, que en su página virtual promocionando el apartamiento, el señor Chamah Martínez no alertaba a sus huéspedes sobre las normas contenidas en el reglamento, según lo requieren los preceptos contenidos en éste relacionados con los arrendamientos.

en la misma es transitoria, tiene efectos calculables sobre el uso y desuso de los elementos comunes y atenta contra la seguridad de los residentes, quienes constantemente tendrán que lidiar con la presencia de huéspedes y, en muchos casos, no podrán identificar qué personas están autorizadas a utilizar las distintas áreas del inmueble.[14]

Además, cualquier acto de vandalismo o criminalidad dentro de los predios del edificio por parte de estos huéspedes podría quedar impune por razón del corto periodo de tiempo durante el cual permanecen en éste. La privacidad, el derecho a la intimidad y la seguridad de los vecinos también podrían verse afectadas por el flujo constante de huéspedes desconocidos y ajenos a la vida y comunidad de carácter residencial prevalentes en el condominio. En cuanto a esto, conviene retomar las expresiones de este Tribunal en *Pueblo v. Pérez Pérez*, 115 DPR 827 (1984) respecto a cómo

> No hallamos base para sostener que en este país de mucha gente y poca tierra aquellos que resuelvan vivir en condominios no tienen derecho razonable a abrigar que su intimidad se respete a un grado

---

[14] En *Goldstein v. Lipetz*, 150 A.D. 3d 562 (NY 2017), el foro más alto del estado de Nueva York abordó este tema y concluyó que "the other residents did not bargain to share the building where they made their homes with a continuous stream of transient strangers (to defendants no less than to themselves) of unknown character and reputation, drawn to the building from all over the world by internet advertising ( . . . ) (tenant's illegal, de facto hotel operation (through Airbnb) showed complete disregard for the legitimate security concerns of landlord and other tenants . . . Seen in this light, defendant's systematic commercial exploitation of her rent stabilized leasehold fully warrants the termination of her lease".

comparable al de los habitantes de residencias tradicionales. Un condómino espera que por los pasillos y otras áreas comunes de su edificio transiten únicamente otros condueños y personas invitadas. En casos como el presente los condueños tienen derecho a confiar que no pululen por las zonas protegidas invasores e intrusos. Los pasillos de los condominios no son calles de la ciudad, ni su garaje es menos privado que el de otro tipo de hogar.

*Id.* en la pág. 830.

Por otro lado, el uso comercial de una unidad ubicada en un condominio residencial puede tener serias repercusiones en lo que atañe la responsabilidad civil del condominio y los seguros adquiridos por éste. Dado que la operación de negocios no está ordinariamente contemplada en las actividades cubiertas por la mayoría de los seguros residenciales, las Juntas de Condóminos deberán evaluar obtener pólizas adicionales, lo que redundará en un aumento a las primas. De lo contrario, podrían estar expuestas a reclamaciones monetarias por actividades que no estén cubiertas en las pólizas vigentes. Permisos y exenciones obtenidas por distintas agencias o instrumentalidades gubernamentales como el Departamento de Bomberos, los distintos municipios y el Departamento de Hacienda para la operación de residencias multifamiliares también podrán verse afectadas por el uso comercial de la propiedad.

De hecho, ante la precariedad financiera que enfrenta la Isla, permitir los alquileres a corto plazo en edificios residenciales pondría en riesgo la posibilidad de miles de familias puertorriqueñas de obtener financiamiento para adquirir una unidad residencial. Ello, puesto que los

préstamos de financiamiento ofrecidos por la Administración de Vivienda Federal (FHA, por sus siglas en inglés) condicionan su concesión a que el inmueble cumpla con ciertos requisitos, entre los que se encuentra que el condominio no sea utilizado para propósitos hosteleros o transitorios y que sus unidades no sean alquiladas por términos menores de treinta (30) días. ("The Mortgagee must obtain the Borrower's agreement that Investment Properties using FHA-insured financing will not be used for hotel or transient purposes, or otherwise rented for periods of less than 30 days.") SF Handbook 4000.1, en la pág. 147.

Permitir los alquileres a corto plazo en condominios de uso residencial afectaría adversamente al más de centenar de condominios que actualmente cuentan con la aprobación de la FHA y consiguientemente cumplen con la referida prohibición reglamentaria. *Véase* https://fhaloans.guide/condos/puerto-rico.[15] Incluso, y concomitante a la certificación de la Sentencia que antecede, la FHA ha reforzado el cumplimiento con las disposiciones que anteceden y ha indicado que las solicitudes de certificación serán denegadas para aquellos

---

[15] Ni pensar en las miles de familias que podrían verse desplazadas o en el efecto que tendría en nuestras áreas residenciales urbanas la primacía de los arrendamientos a corto plazo. Ello, a su vez, resultaría en que personas y familias en busca de residencia permanente se verán imposibilitadas de costear los gastos del arrendamiento por noche en una fórmula mensual o anual. Ciertamente, la explotación comercial mediante alquileres a corto plazo resultará en la renuencia de los titulares de establecer términos de arrendamiento más extensos y, por tanto, compatibles con el uso residencial al que está destinada el área o el inmueble, en el caso de edificios sujetos al régimen de propiedad horizontal.

condominios en los cuales se arrienden apartamientos por términos menores de treinta (30) días. Medios locales han indicado que estos refuerzos para exigir el cumplimiento con la prohibición de alquileres a corto plazo podrían perjudicar las posibilidades de compra o refinanciamiento de los titulares de condominios. *Véase Peligra el acceso a los préstamos con los arrendamientos a corto plazo*, https://www.noticel.com/economia/peligra-el-acceso-a-presta mos-con-los-arrendamientos-a-corto-plazo/1068518370 (última visita 15 de abril de 2019).

Al momento de obtener su propiedad, los residentes del Condominio Condesa del Mar lo hicieron conscientes de que adquirían un apartamiento que sólo podría ser utilizado para fines residenciales, puesto que así se fijaba el alcance de su derecho propietario en la escritura matriz. Consiguientemente, en ningún momento pensaron que la propiedad en la que invertían se convertiría en una hospedería turística con fines comerciales. Tanto la escritura matriz como el reglamento sirvieron el propósito de informarles adecuadamente sobre el uso residencial al que estaba destinado el inmueble. Dicha designación tiene fuerza de ley entre las partes y todos los titulares, independientemente del momento en que hayan adquirido su propiedad, están obligados a observarla y darle fiel cumplimiento. Categorizar una actividad comercial como una afín con un uso residencial supondría un menoscabo implícito por parte de este Tribunal a la voluntad de las partes y las

obligaciones contractuales contraídas por éstas. Por tal razón, estimo que el Tribunal de Apelaciones erró al concluir que el arrendamiento a corto plazo no contravenía las disposiciones contenidas en la escritura matriz y el reglamento y no constituía una violación al uso residencial al que estaba destinado el Condominio Condesa del Mar.

Al margen de las acciones que puedan tomar las Juntas de Condóminos para atajar el problema que suponen la proliferación de las plataformas cibernéticas para promover el alquiler de propiedades a corto plazo, resulta preciso señalar que la dificultad al momento de abordar estos nuevos modelos económicos estriba en la ausencia de legislación que propicie su efectiva implantación y sea cónsona con las realidades sociales y económicas de nuestro País.[16] En cuanto a los alquileres a corto plazo por particulares, se trata de una actividad económica que ha prosperado en un marco de fiscalización incierto. La delimitación de requisitos mínimos relacionados con la salubridad y la seguridad, así como exigencias relacionadas con los deberes y obligaciones de los huéspedes y los propietarios, la responsabilidad tributaria de los arrendadores, entre otros aspectos, resultan esenciales al momento de implementar este tipo de modelo de negocios. Máxime, en una jurisdicción como la

---

[16] Expertos en este fenómeno global lo han descrito como uno de carácter "transversal, ya que no se encuentra circunscrito a un sector económico concreto". Así, explican que "[s]us manifestaciones se extienden a distintos segmentos de la economía, afectando crecientemente a los actuales tres macro sectores de la agricultura, la industria y los servicios". Fernández Pérez, supra, en las págs. 34-35.

nuestra en la cual el turismo figura como una industria prioritaria.

En cuanto a la falta de fiscalización del uso de plataformas colaborativas para el alojamiento con finalidad turística, se ha señalado que

> El respeto a la libertad competitiva implica la igualdad jurídica de los competidores. Por ello, en el ámbito del denominado alojamiento colaborativo es esencial determinar si existe o no igualdad entre aquellos que ofertan los servicios, esto es, si los servicios ofrecidos por los particulares y los ofrecidos por los por los responsables de alojamientos hoteleros y similares resultan equivalentes. Si así fuera, lo cierto es que podría colocar a los empresarios turísticos en una situación de desigualdad de condiciones. Además de esta circunstancia, debe resaltarse que la ausencia de cumplimiento con esas normas, relativas muchas de ellas a la contratación de seguros, o a medidas de higiene así como a la responsabilidad por los problemas que puedan tener los huéspedes, puede poner en riesgo también la situación de los consumidores, en la medida en que puedan resultar perjudicados.

Fernández Pérez, *supra*, en las págs. 60-61.

No albergo duda de que el alojamiento colaborativo podría potenciar el sector turístico y promover el empresarismo local. Lo cierto es, sin embargo, que corresponde a las ramas políticas delinear los contornos que han de regir este nuevo tipo de modelo mercantil. A fin de cuentas, aquellas personas que alquilan a corto plazo sus propiedades para fines turísticos mediante plataformas como *Home Away* y *Airbnb* realizan una actividad económica importante sin contar -en muchos casos- con la experiencia empresarial y los credenciales profesionales necesarios.

Así, pues, "la pieza fundamental es el desarrollo de una normativa que permita un uso responsable de estas plataformas, así como la convivencia de los nuevos operadores en los sectores tradicionales". *Id.* en la pág. 66.

Estimo que, en el contexto particular de la horizontalidad, las prerrogativas y acuerdos de los titulares con relación al uso para el cual está designada su propiedad deben prevalecer sobre cualquier intento gubernamental de imponer unilateralmente una restricción tan severa al ejercicio de su derecho propietario. Esta interpretación que del alcance del concepto de uso residencial es cónsona con las disposiciones legales y reglamentarias aplicables, así como con la voluntad de los titulares al momento de adscribirle dicho uso al Condominio Condesa del Mar. Consiguientemente, considero que el Tribunal de Apelaciones erró al ampliar el alcance de ese término y concluir que los arrendamientos a corto plazo eran compatibles con el uso residencial al que estaba destinado el inmueble.

En atención a lo anterior, entiendo que era innecesario que la Junta de Condóminos en este caso enmendara su reglamento para expresamente prohibir los arrendamientos a corto plazo aquí en controversia. Contrario a lo que concluyó el Tribunal de Apelaciones, tanto en la escritura matriz como en el reglamento se hace una designación expresa de uso residencial. Esto necesariamente conlleva la exclusión de los arrendamientos a corto plazo, en tanto y cuanto los mismos suponen una explotación comercial del todo

incompatible con el destino residencial del inmueble que, además, sobrelleva una infinidad de repercusiones sobre su régimen constitutivo, su administración, la intimidad y seguridad de los residentes, y el derecho propietario de sus titulares.

Después de todo, la controversia ante la consideración de este Tribunal no requería que resolviéramos alguno de los grandes misterios de la Historia; como, por ejemplo, si existió el reino mítico de la Atlántida, si en efecto en el triángulo de las Bermudas desaparecen aviones o qué le pasó a Amelia Earhart. Y es que constatar qué constituye un uso residencial no es nada enigmático; sólo requería una aplicación concienzuda del sentido común.

## VII.

Por los fundamentos que anteceden, hubiese revocado el dictamen del Tribunal de Apelaciones y reinstalado en su totalidad la sentencia declaratoria dictada por el Tribunal de Primera Instancia mediante la cual se concluyó que el alquiler de una unidad a corto plazo en un condominio sujeto al régimen de propiedad horizontal era incompatible con el uso residencial fijado en la escritura matriz del inmueble.

                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Consejo de Titulares del Condominio Condesa del Mar<br><br>Peticionario<br><br>v.<br><br>Eduardo Chamah Martínez<br><br>Recurrido | | AC-2018-0002 |

Opinión disidente emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 15 de abril de 2019.

> "La parte apelante se reafirma en que la controversia presentada ante este ilustre Tribunal no se torna académica por el mero hecho de que el Reglamento se haya enmendado para prohibir que los apartamientos se transformen en hospederías". Lcdo. Michel J. Godreau Robles, representante legal de Consejo de Titulares del Condominio Condesa del Mar, Moción en Cumplimiento de Orden, pág. 1.

La interpretación errónea del derecho y su aplicación a un acto aislado para desechar una controversia en los méritos que se mantiene viva entre las partes y que incide en el desarrollo socioeconómico y de la economía colaborativa de Puerto Rico, conduce a este Tribunal a la utilización inadecuada de la doctrina de academicidad. Específicamente, hoy se interpreta erróneamente que el acto de enmendar un reglamento de un condominio sometido al

régimen de propiedad horizontal, para validar una prohibición que es tajantemente contraria a la escritura matriz y que incide en el disfrute, el dominio y el interés propietario que tienen los titulares de sus unidades de vivienda, tornó una controversia en académica. Por considerar que, a la luz del derecho aplicable y en virtud de los postulados de agilidad y economía procesal, la controversia no solo persistió, sino que se recrudeció, por lo que requería ser adjudicada para conceder un remedio adecuado, completo y oportuno a las partes y vinculante a la sociedad en general, disiento.

I

En el año 1986, el Condominio Condesa del Mar (Condominio) fue sometido al régimen de propiedad horizontal. La escritura matriz del mismo limitó el uso de los apartamentos a uno residencial, sin más restricciones al respecto.[17] Además, reconoció que la edificación estaría compuesta de unidades individuales separadas e independientes en las cuales cada propietario adquiriría un derecho de propiedad particular y exclusivo sobre su unidad y un derecho conjunto de co-propiedad sobre los elementos comunes.[18]

En su momento, el Sr. Eduardo Chamah Martínez (señor Chamah) adquirió y se hizo titular del apartamento 702 del Condominio. Como parte de la administración de su propiedad, el señor Chamah optó por arrendar a corto plazo su apartamento, a través de una plataforma electrónica. En oposición a tal práctica, la

---

[17]En específico, la escritura matriz establece: "El edificio está destinado a residencias y facilidades relacionadas". <u>Escritura estableciendo régimen de la propiedad horizontal para edificio de apartamentos</u>, pág. 16.

[18]Íd., pág. 5.

administración del Condominio argumentó que se trataba de un uso comercial de la propiedad que estaba vedado por la escritura matriz y el reglamento.

Eventualmente, el Consejo de Titulares del Condominio Condesa del Mar (Consejo) presentó una acción de sentencia declaratoria en contra del señor Chamah.[19] En respuesta, éste último refutó que los arrendamientos a corto plazo en su apartamento fuesen contrarios al uso residencial destinado en la escritura matriz del Condominio.

Ante tal controversia, el Tribunal de Primera Instancia determinó que el alquiler a corto plazo en disputa se trataba de un uso comercial del apartamento y que ello contravenía tanto la escritura matriz como el reglamento del Condominio. De ese modo, declaró con lugar la demanda presentada por el Consejo.

En desacuerdo, el señor Chamah acudió al Tribunal de Apelaciones. Tras evaluar ambas posturas, el Tribunal de Apelaciones revocó el dictamen del foro primario. Determinó que el uso residencial del apartamento en un alquiler a largo plazo era el mismo que en los arrendamientos a corto plazo. Así, razonó que la extensión del alquiler no variaba el uso y el destino del apartamento. Por ello, concluyó que el uso que le daba el señor Chamah a su apartamento no era contrario a lo establecido en la escritura matriz y en el reglamento del Condominio. A tales efectos, se expresó como sigue:

El arrendamiento de menos de noventa 90 días sigue siendo arrendamiento, al igual que el de sobre 90 días. La cantidad de

---

[19]Inicialmente, también incluyeron una acción de injunction, pero luego desistieron de la misma y continuó el caso por la vía ordinaria para dilucidar el asunto de la sentencia declaratoria.

días del alquiler, al igual que lo es el canon de renta, son términos específicos de un arrendamiento. El derecho de los titulares a arrendar sus apartamentos por el término que entiendan conveniente se encuentra subsumido en su derecho a ejercer el pleno dominio sobre su propiedad.[20]

En consecuencia, el Consejo presentó el recurso ante nuestra consideración, el cual acogimos como _certiorari_ y optamos por expedirlo. Posteriormente, el 14 de noviembre de 2018, celebramos una vista oral en la cual ambas partes tuvieron la oportunidad de argumentar sus respectivas posturas. Durante esta vista, se anunció la posibilidad de que un bloque de titulares tramitara una enmienda al reglamento del Condominio para intentar prohibir expresamente los arrendamientos a corto plazo. A raíz de ello, se le proveyó al Consejo un término de noventa días para informar al Tribunal el resultado de tal trámite. En cumplimiento con lo ordenado, el Consejo notificó que, en efecto, el reglamento, no así la escritura matriz, había sido enmendado a los fines de prohibir expresamente los arrendamientos a corto plazo. Por tratarse de una enmienda al reglamento, la misma contó con la aprobación de 2/3 partes de los titulares.

A base de esta reciente enmienda al reglamento del Condominio, una Mayoría de este Tribunal decide erróneamente desestimar el presente recurso bajo la doctrina de academicidad. A continuación, discuto los fundamentos por los que entiendo la controversia continua viva y capaz de ser atendida por este Máximo Foro. Veamos.

II

---

[20]Sentencia del Tribunal de Apelaciones, pág. 8.

Como es norma conocida, la academicidad es una de las doctrinas que autolimitan la intervención judicial. Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 932 (2011). La doctrina de academicidad requiere que, en todo pleito presentado ante un tribunal, exista una controversia real entre las partes. Amador Roberts et als. v. ELA, 191 DPR 268, 282 (2014). Así, como corolario de la doctrina de justiciabilidad, los tribunales deben abstenerse de atender controversias cuyos acontecimientos y cambios durante el trámite judicial tornan su solución en académica o ficticia. Com. de la Mujer v. Srio. de Justicia, 109 DPR 715, 724-725 (1980).

Ahora bien, la academicidad no es una norma absoluta, por lo que hemos reconocido escenarios excepcionales en los que procede nuestra intervención judicial en aras de proteger los intereses de la justicia. Estos son: (1) cuando se plantea ante el foro judicial una cuestión recurrente o susceptible de volver a ocurrir y que tienda a evadir la revisión judicial; (2) cuando la situación de hechos ha sido modificada por el demandado, pero el cambio no aparenta ser permanente, y (3) cuando se tornan académicos aspectos de la controversia, pero subsisten consecuencias colaterales vigentes. Asoc. Fotoperiodistas v. Rivera Schatz, supra, pág. 933. Según adelanté, en el caso de autos, no cabe hablar de academicidad, pues la enmienda al reglamento del Condominio a los fines de restringir el término de los arrendamientos no convirtió en inexistente la controversia. Al no realizarse la enmienda en la escritura matriz, la controversia continúa siendo una viva y real entre las partes. Máxime, cuando el propósito de tal enmienda es restringir el uso de las unidades de vivienda. Esta restricción no está contemplada en la escritura matriz y es contraria a los derechos generales reconocidos en la propia ley. Me explico.

La Ley de Condominios, según enmendada,[21] dispone que "[l]a escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el destino y uso de toda área comprendida en el inmueble, y, excepto que este capítulo autorice lo contrario, **una vez fijado dicho destino y uso sólo podrá ser variado mediante el consentimiento unánime de los titulares**". (Énfasis suplido). 31 LPRA sec. 1291. En cuanto a los derechos de los titulares de los apartamentos, reconoce que los mismos tendrán dominio sobre su unidad de vivienda y con ello llevar a cabo toda clase de actos jurídicos, lo que incluiría los arrendamientos. A tales efectos, establece lo siguiente:

Una vez se haya constituido el inmueble en régimen de propiedad horizontal, los apartamientos expresados en la sec. 1291a de este título **podrán individualmente transmitirse y gravarse y ser objeto de dominio o posesión, y de toda clase de actos jurídicos ínter vivos o mortis causa, con independencia total del resto del inmueble de que formen parte**, y los títulos correspondientes serán inscribibles en el registro de la propiedad de acuerdo con lo dispuesto en este capítulo y en la Ley Hipotecaria y del Registro de la Propiedad. (Énfasis suplido). 31 LPRA sec. 1291b.

Por otra parte, el reglamento podrá tener todas aquellas normas y reglas en torno al uso del inmueble y sus apartamentos, siempre y cuando, no contravenga las disposiciones de la ley y la escritura matriz. 31 LPRA sec. 1293a. Éste podrá ser modificado por dos terceras partes de los titulares y de porcentajes de participación en los elementos comunes del inmueble. Íd.

---

[21]Ley Núm. 104 de 25 de junio de 1958, enmendada por la Ley Núm. 103-2003.

Ahora bien, la escritura matriz y el reglamento no son una sola fuente de obligaciones para los participantes del régimen. Soto Vázquez v. Vázquez Torres, 138 DPR 282, 295 (1995). Esta primera es de mayor jerarquía por constituir el contrato que rige a los titulares. Ello, particularmente se percibe cuando una enmienda a la escritura requiere unanimidad, mientras que una enmienda al reglamento sólo una mayoría. El requerimiento del consentimiento unánime sirve como "un mecanismo para preservar los derechos fundamentales propios del dominio en un medio deliberativo en el que se aprueban asuntos que afectan adversamente el disfrute de la propiedad privada y en condominio". Rivera Rodríguez v. Junta Dir. I y II, 173 DPR 475, 483 (2008). Cuando se trate de asuntos que afecten el disfrute de la propiedad, ya sea la privada o del condominio, el requisito de unanimidad es esencial para preservar los derechos fundamentales propios de dominio. Consejo Titulares v. Ramos Vázquez, 186 DPR 311, 340 (2012). En cambio, cuando se trate de asuntos relativos a la conservación y administración de los elementos comunes, la Ley de Condominios se inclina a requerir el consentimiento de la mayoría. Íd.

La enmienda al reglamento, sobre la cual la Mayoría de este Tribunal basa su decisión para desestimar el presente caso, limita indebidamente el derecho a la propiedad de los titulares del Condominio. Ello, al imponerles el término sobre el cual podrán arrendar sus apartamentos; una restricción que no es acorde con la escritura matriz. Así también lo reconoce el propio Consejo en su comparecencia ante este Foro. **Allí señala que la controversia no se ha tornado académica, pues entiende que la posición de la parte demandante es que la prohibición a los arrendamientos a corto plazo debe hacerse por enmienda a la escritura matriz.**

Véase, Moción en Cumplimiento de Orden, presentada el 11 de febrero de 2019.

La enmienda al reglamento del Condominio, prohibiendo expresamente los arrendamientos de un término menor de noventa días, no debe privar a este Tribunal de emitir un remedio adecuado, completo y oportuno en ley. Por el contrario, este Tribunal, como máximo foro apelativo, tiene la facultad y la responsabilidad de determinar si tal enmienda al reglamento impuso una restricción válida, lo cual opino no lo fue, e interpretar la compatibilidad de los arrendamientos a corto plazo con el uso residencial de los apartamentos.

No podemos perder de perspectiva que esta controversia incide en el derecho constitucional al disfrute a la propiedad privada, Const. PR, Art. II, sec. 7, y que es de alto interés público.[22] Es palpable que los arrendamientos a corto plazo están en boga no solo en nuestra jurisdicción, sino a nivel mundial. Por ello, no debe haber la menor duda que los arrendamientos a corto plazo han tomado un gran auge y que controversias como la de autos están muy presentes en los condominios o comunidades bajo el régimen de propiedad horizontal en nuestra jurisdicción.

Así, la interpretación de los arrendamientos a corto plazo en el contexto del régimen de propiedad horizontal amerita el pronunciamiento de este Tribunal en el ámbito de una controversia que lejos de morir, se recrudeció mediante la enmienda al reglamento. El Derecho no ha cambiado, como erróneamente aduce la Sentencia de este Tribunal. Lo que realmente ocurrió es que un

---

[22]En la exposición de motivos de la Ley de Condominios, Ley Núm. 103-2003, se reviste el régimen de propiedad horizontal de interés público por la función que tiene en el desarrollo urbano.

sector de los titulares intentó cambiarlo, pero ellos mismos reconocen que tal acto no tornó la controversia en académica por no haber cumplido con todas las exigencias de la Ley de Condominios para ese fin.

A tenor con todo lo anterior, me reitero en que la controversia de autos no se tornó académica con la reciente enmienda realizada al reglamento. Ello, pues la prohibición no surge así de la escritura matriz. Al no constar en esta última, la controversia sigue siendo una viva y justiciable.

Aclarado el asunto sobre la academicidad, procedo a atender la controversia en los méritos.

### III

Como vimos, la controversia en los méritos requería dilucidar si los arrendamientos a corto plazo en un condominio sometido al régimen de propiedad horizontal son cónsonos con el uso residencial plasmado en la escritura matriz y el reglamento del condominio o, si por el contrario, representan un uso comercial incompatible con éstos. Para ello, resulta conveniente hacer referencia al derecho aplicable sobre el régimen de propiedad horizontal.

El régimen de propiedad horizontal se adoptó en nuestra jurisdicción con el fin de proveerle al ciudadano la posibilidad de disfrutar el derecho a la propiedad plena e individual de un inmueble ubicado en un edificio, a la vez que se logra maximizar el uso del terreno. Consejo Titulares v. DACo, 181 DPR 945, 953 (2011). De ese modo, este régimen entrelaza dos formas independientes de propiedad: la propiedad privativa sobre el piso o apartamento y la copropiedad sobre los elementos comunes, siendo esta última accesoria a la propiedad sobre espacios privados. Cestero Aguilar v. Jta. Dir. Condominio, 184 DPR 1, 10 (2011).

Actualmente, nuestra Ley de Condominios, supra, tiene como uno de sus objetivos hacer factible el derecho a la propiedad individual sobre un apartamento en un edificio, salvaguardando el fin de aprovechar al máximo posible nuestra extensión territorial. Bravman, González v. Consejo Titulares, 183 DPR 827, 843 (2011). Al convergir el derecho individual de propiedad con el derecho al uso de áreas comunes, el estatuto reconoce que los apartamientos podrán transmitirse, gravarse, ser objeto de dominio o posesión y de toda clase de actos jurídicos. 31 LPRA sec. 1291b.

La Ley de Condominios, supra, reconoce la escritura matriz como una piedra angular del régimen al disponer que tiene la función de establecer el régimen de propiedad horizontal y, con ello, expresar "clara y precisamente el destino y uso de toda área comprendida en el inmueble". 31 LPRA sec. 1291. Así, esta escritura es un estatuto privado que gobierna a los condóminos o titulares y a cuyas disposiciones debemos acudir para dirimir cualquier conflicto. Bravman, González v. Consejo Titulares, supra, pág. 845; Brown III v. JD Cond. Playa Grande, 154 DPR 225, 232 (2011). Ello, dado a que "todos y cada uno de los titulares al comprar sus respectivos apartamientos llevaron a efecto un claro acto de adhesión a lo allí estipulado". Consejo de Titulares v. Vargas, 101 DPR 579, 582-583 (1973). Asimismo, el estatuto establece que los apartamientos se dedicarán sólo al uso dispuesto en la escritura matriz. 31 LPRA sec. 1291m(a).

La fijación de un uso o destino para los apartamentos en la escritura provee un aviso adecuado a los terceros interesados sobre la conducta y actividades que pueden esperar de sus cotitulares. Soto Vázquez v. Vázquez Torres, supra. El criterio más importante al determinar si la designación de un uso cumple con la ley es que informe debidamente y sin ambigüedades a los

nuevos adquirentes y terceros. Cond. Prof. SJH Centre v. PRF Inc., 133 DPR 488, 504. Aun cuando no equiparamos las restricciones al uso con las servidumbres en equidad, estas constituyen verdaderas limitaciones al dominio singular del propietario. Soto Vázquez v. Vázquez Torres, supra. Por su efecto sobre el derecho propietario de los titulares, éstas deben ser interpretadas de forma estricta y restrictiva, pues es principio básico de nuestro ordenamiento que la propiedad se presume libre de cargas y gravámenes. Íd. De manera, que cuando se pretenda prohibir una actividad específica, se requiere el cumplimiento de los requisitos de la condición restrictiva o servidumbre en equidad de que se trate. S.L.G. Szendrey-Ramos v. Consejo de Titulares, 184 DPR 133, 160 (2011). Lo anterior implica la necesidad de consignar de forma expresa en la escritura matriz del condominio que el apartamento no podrá ser utilizado para otro tipo de actividad. Íd. Esto, debido a que, una vez la escritura matriz es inscrita en el Registro de la Propiedad, esta pasa a ser un estatuto privado que gobierna a los titulares y obliga a terceros. Bravman, González v. Consejo Titulares, supra.

Con este marco legal, procedo a atender la controversia en los méritos.

IV

Como mencioné, en el caso de autos, la controversia a atenderse es si los arrendamientos a corto plazo son compatibles con el uso residencial establecido en la escritura matriz. Mi respuesta es en la afirmativa.

De entrada, la escritura matriz del Condominio no establece categóricamente que los arrendamientos a corto plazo son incompatibles con el uso residencial destinado a los apartamentos ni los prohíbe expresamente. Más bien, reconoce el derecho

individual de cada propietario sobre su unidad de vivienda y la escritura no limita la prerrogativa de cada titular de ejercer pleno dominio sobre su propiedad. Así, no impone restricción alguna a los arrendamientos, los cuales forman parte del ejercicio de tal dominio. La escritura no plasma una prohibición expresa a los arrendamientos ni a corto ni a largo plazo. Tampoco los concibe como incompatibles con el término residencial. Expresado de otro modo, la escritura matriz permite los arrendamientos sin distinción temporal. Para disponer lo contrario, la escritura debía tener una prohibición expresa que cumpliera con la debida notificación a cualquier persona que decidiera someterse al régimen de propiedad horizontal.

No debemos olvidar que la escritura matriz es "la fuente vinculante más importante para los condóminos, luego de la ley". M. Grodreau, El Condominio: El Régimen de Propiedad Horizontal en Puerto Rico, 2da ed., San Juan, Ed. Situm, 2019, pág. 115. Ello, pues su decisión de someterse al régimen está basada en los datos allí incluidos y las limitaciones específicas allí plasmadas. La interpretación que se haga de la escritura matriz no debe de manera alguna limitar o restringir los derechos de propiedad de los titulares más allá de lo allí plasmado. De una lectura a la escritura matriz aquí en controversia, no puede razonablemente concluirse que los arrendamientos a corto plazo estén vedados. Una interpretación en contrario laceraría y menoscabaría indebidamente el derecho individual de cada titular al disfrute de su propiedad.[23]

_____

[23]La escritura matriz del Condominio Condesa del Mar reconoce que la edificación está compuesta de unidades individuales separadas e independientes en las cuales cada propietario adquiriría un derecho de propiedad particular y exclusivo sobre su unidad y un derecho conjunto de co-propiedad sobre los elementos

La postura principal del Consejo es que los arrendamientos a corto plazo son de índole comercial y, como tal, incompatibles con el uso residencial. Sin embargo, el carácter residencial de una unidad de vivienda debe ser definido por el tipo de actividad que se lleva a cabo en el mismo y no por el término en el que se ejerce el arrendamiento. Si los alquileres a largo plazo no son considerados como actividades comerciales, sino, más bien, residenciales, ¿por qué no así los que son a corto plazo? Éstos también se utilizan para fines residenciales, entiéndase: dormir, comer, guarecerse, utilizar los elementos comunes, entre otros asuntos, propios del uso residencial de una vivienda bajo el régimen de propiedad horizontal. Por consiguiente, me parece desacertado concluir que sea el término –y no el propósito– del arrendamiento lo que defina el uso y el destino de la unidad de vivienda.

Una interpretación similar ha sido adoptada en varias jurisdicciones de Estados Unidos, a las cuales hago referencia a modo persuasivo por tratar la controversia con mayor precisión. Distintos tribunales estatales han resuelto que una servidumbre en equidad que limite la propiedad a un uso residencial o que prohíba el uso comercial en la misma no equivale a una prohibición a los arrendamientos a corto plazo. Forshee v. Neuscwander, 914 N.W. 2d 643 (Wis. 2018) (we conclude that the term, "commercial activity," which is undefined in the covenant, is ambiguous. Therefore, we narrowly interpret it and conclude that it does not preclude either short-term or long-term rentals); Tarr v. Timberwood Park Owners Association, Inc., 556 S.W. 3d 274 (Tex.

---

comunes. Escritura estableciendo régimen de la propiedad horizontal para edificio de apartamentos, pág. 5.

2018) (we hold that so long as the occupants to whom Tarr rents his single-family residence use the home for a "residential purpose," no matter how short-lived, neither their on-property use nor Tarr's off-property use violates the restrictive covenants in the Timberwood deeds. Moreover, Tarr's use does not qualify as a commercial use.); Vera Lee Angel Revocable Trust v. Jim O'Bryant and Kay O'Bryant Joint Revocable Trust, 537 S.W. 3d 254 (Ark. 2018) (the short-term rentals in the case before us did not transform the character of the subdivision); Wilkinson v. Chiwawa Communities Ass'n, 327 P.3d 614 (2014) (If a vacation renter uses a home 'for the purposes of eating, sleeping, and other residential purposes,' this use is residential, not commercial, no matter how short the rental duration); Slaby v. Mountain River Estates Residential Ass'n, 100 So.3d 569, 580 (Ala.Civ.App.2012) (property is used for "residential purposes" when those occupying it do so for ordinary living purposes); Scott v. Walker, 645 S.E. 2d 278 (Va. 2007)(In the absence of language expressly or by necessary implication prohibiting nightly or weekly rentals, we find that the Scotts' short-term rental of their property did not run afoul of the restrictive covenant at issue.); Pinehaven Planning Bd. v. Brooks, 70 P.3d 664 (Ida. 2003) (Renting the property for residential purposes, whether short or long-term, does not fit within these prohibitions. The only building on the Brooks' property remains a single-family dwelling and renting this dwelling to people who use it for the purposes of eating, sleeping, and other residential purposes does not violate the prohibition on commercial and business activity as such terms are commonly understood).

El razonamiento utilizado por estos tribunales estatales, en su mayoría foros de última instancia, es similar. Se fundamentan en

la interpretación restrictiva que se le debe dar a las servidumbres en equidad. Basados en ello, concluyen que la restricción de uso residencial a una propiedad no puede extrapolarse a una prohibición a los arrendamientos a corto plazo. Como mencioné, las restricciones en las escrituras bajo el régimen de propiedad horizontal no son propiamente servidumbres en equidad, pero, aun así, este Tribunal ha resuelto que su interpretación debe ser una restrictiva, similar a las servidumbres en equidad. Como tal, esta jurisprudencia resulta ilustrativa a la hora de resolver la presente controversia.

Por otra parte, uno de los argumentos principales del Consejo es que la Ley del Impuesto sobre el Canon por Ocupación de Habitación del Estado Libre Asociado de Puerto Rico, Ley Núm. 272-2003, 13 LPRA sec. 2271, incluye el arrendamiento a corto plazo dentro del concepto "hospedería", lo que convierte tal uso en uno comercial. Ahora bien, de su Exposición de Motivos se puede percibir que este estatuto tiene un fin estrictamente tributario, al cobrar un impuesto en lo que define como "hospederías". Como parte del mismo, se incluyeron los "alojamientos suplementarios a corto plazo". Éstos se definen como:

[C]ualquier instalación, edificio o parte de un edificio, dado en alquiler por un período de tiempo menor a noventa (90) días, dedicado al alojamiento de personas mediante paga, cuya instalación, edificio o parte del mismo no sea un hotel, condohotel, hotel todo incluido, motel, Parador, pequeña hospedería, casa de hospedaje y/hotel de apartamentos. Dicho término incluirá, sin limitarse a, cualquier tipo de propuesta de alojamiento alternativo como casas, apartamentos, cabañas, villas, casas rodantes (móviles), flotantes, botes, entre otros conceptos

de arrendamientos por un término menor de noventa (90) días. 13 LPRA sec. 2271(2).


Del historial legislativo se desprende que la inclusión de lo anterior fue expandir "el pago de impuestos por habitación a otro tipo de medios suplementarios de alojamiento". Informe de la Cámara de Representantes sobre el P. de la C. 3820 de 23 de junio de 2003, 14ta Asamblea Legislativa, 5ta sesión ordinaria, pág. 2. Por ello, los arrendamientos a corto plazo no se conceptualizaron a modo de hoteles o paradores, según planteó el Consejo. Prácticamente, lo que propone el Consejo es aplicar las disposiciones de una ley con una finalidad en particular a una controversia jurídica distinta. Sabido es que una actividad tributable no es sinónimo de una actividad comercial. Véase, National Federation of Independent Business v. Sebelius, 567 US 519 (2012). Las actividades comerciales no son las únicas que tributan, pues de igual modo, pueden ser sujetos a tributar propiedades, salarios y servicios. El hecho de que se cobre un impuesto no es suficiente para concluir que el arrendamiento a corto plazo sea una actividad comercial incompatible con el uso residencial exigido en la escritura matriz. Así, la definición de "alojamientos suplementarios a corto plazo" no debe determinar la naturaleza de la actividad que se lleva a cabo en un régimen de propiedad horizontal.

Desechar la realidad de que el carácter residencial es definido por el tipo de actividad que se lleva a cabo, lleva al absurdo de interpretar que un arrendamiento de noventa días se catalogue como un uso comercial de la propiedad arrendada, mientras que un arrendamiento de noventa y un días no. Es decir, que la sola concepción de veinticuatro horas varíe el uso de la propiedad aun

cuando se utilice de la misma manera y realizando las mismas actividades. Ciertamente, tanto los arrendamientos a largo plazo como los arrendamientos con términos cortos tienen una misma finalidad, generar ingresos al arrendador.[24] Sin embargo, se pretende concebir irrazonablemente uno como residencial y el otro como comercial. Me parece desacertado recurrir a este estatuto tributario para definir el uso y la naturaleza de la propiedad en cuestión. Ello, cuando lo que procede es analizar si en el arrendamiento a corto plazo se realizan actividades propias de un uso residencial o comercial, lo que incide propiamente en las actividades desplegadas en este condominio bajo el régimen de propiedad horizontal.

Asimismo, entiendo que el fin turístico tampoco debe ser un elemento decisivo para concluir que los arrendamientos a corto plazo son de índole comercial. Las actividades que lleven a cabo los arrendatarios fuera del Condominio no inciden en el uso que le dan al apartamento. Lo medular son las actividades que llevan a cabo en el apartamento y en las inmediaciones del condominio.

Por otro lado, aquí no podemos hablar que el arrendamiento a corto plazo lacera la seguridad, tranquilidad o la vida en comunidad de los residentes de este Condominio, pues no hay hechos concretos sobre este particular. Además, los arrendatarios a corto plazo, al igual que los arrendatarios a largo plazo y los titulares, tienen la responsabilidad de cumplir con las normas establecidas en los condominios. 31 LPRA sec. 1291m-1. De igual forma, un arrendatario a largo plazo o, incluso, un titular podría incidir negativamente en tales aspectos. Concluir categóricamente que los

---

[24]De igual forma, las plataformas electrónicas que promueven arrendamientos a corto plazo y las que lo promueven a largo plazo también operan con fines lucrativos.

arrendamientos a corto plazo atentan contra la sana convivencia de los titulares de un condominio sería una especulación y generalización innecesaria. Así ha sido reconocido en otras jurisdicciones bajo el régimen de propiedad horizontal, como en Cataluña, cuando su Tribunal Superior resolvió que "no puede declararse en abstracto que la vivienda de uso turístico comporte una actividad no permitida e incompatible con la normal convivencia cuando se ubique en comunidades de viviendas de uso residencial sometidas a las reglas de la propiedad horizontal". Sentencia 33/2016 de Tribunal Superior de Justicia de Cataluña (19 de mayo de 2016). A ello, añadió que correspondía analizar "si la concreta actividad llevada a cabo en dicha vivienda, por su forma de ejercicio, puede ser calificada de conducta contraria a la normal convivencia de la comunidad". Íd. De todas maneras, de surgir algún asunto que atente contra la sana convivencia o que estén en riesgo los elementos comunes del Condominio, el titular, en este caso, el señor Chamah, continuaría respondiendo ante el Consejo y la administración del Condominio. 31 LPRA sec. 1291m(g). Por consiguiente, los restantes titulares del Condominio gozarán de la misma protección, ya sea un arrendatario a largo plazo o a corto plazo.

A raíz de todo lo antes expuesto, no puedo más que concluir que los arrendamientos a corto plazo que el señor Chamah lleva a cabo en su apartamento son compatibles con el uso residencial exigido en la escritura matriz. Siempre y cuando el arrendatario, independientemente del término de tal arrendamiento, le brinde un uso residencial a la propiedad arrendada. Entiéndase, que si el arrendatario utiliza el apartamento en función de vivienda, aunque sea por un período corto de tiempo, el uso que se le está dando al apartamento es residencial. Una interpretación distinta sería

intervenir indebidamente con el derecho individual del señor Chamah al disfrute de su propiedad y extrapolar las limitaciones establecidas en la escritura matriz. Estos arrendamientos a corto plazo sólo podrían restringirse cuando estén expresamente prohibidos en los estatutos que regulan cada condominio sometido al régimen de propiedad horizontal. De determinarse lo contrario, estaríamos enmendando, sin base legal, cientos de escrituras matrices por vía judicial y, como consecuencia, evadiendo la unanimidad del voto de los titulares que requiere la Ley de Condominios, _supra_. Lo que a su vez implicaría ir en contra de los principios del régimen de propiedad horizontal. Por tanto, sostengo que los arrendamientos a corto plazo son compatibles con el uso y el destino residencial de un apartamento sometido al régimen de propiedad horizontal.

## IV

Por los fundamentos expuestos anteriormente, disiento del curso de acción adoptado por una Mayoría de este Tribunal, pues no procedía la desestimación del caso de epígrafe. Por el contrario, hubiese atendido la controversia en los méritos para confirmar la sentencia del Tribunal de Apelaciones.

Luis F. Estrella Martínez
Juez Asociado